**Ihor KLEBAN, Plaintiff,**

**v.**

**S.Y.S. RESTAURANT MANAGEMENT, INC., an Illinois Corporation, International Double Drive–Thru, Inc., an Illinois Corporation, Andrew Sun, John Young, Thomas J. Singer, John D. Terzakis, individually and d/b/a Midwest Properties, James W. Thompson, Jr., individually and d/b/a James Thompson Agency, Joseph Tedesco, individually and d/b/a Tedesco and Associates, John A. Garrity III, Esq., Michael Mullally,**

St. Louis Double Drive–Thru, Inc., an Illinois Corporation, Willowbrook Restaurant Corporation, an Illinois Corporation, Illinois Petroleum Co. an Illinois Corporation, Restaurant Development Corporation, an Illinois Corporation, Greenscape Landscaping, Inc., an Illinois Corporation, Defendants.

No. 95 C 2920.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 20, 1995.

David Scott Grosky, for Ihor Kleban.

Robert A. Habib, Chicago, IL, for S.Y.S. Restaurant Management Inc., International Double Drive–Thru, Inc., Andrew Sun, John Young.

Thomas J. Singer, Charleston, IL, pro se.

James K. Meguerian, Victoria Perette Pappas, D'Ancona & Pflaum, Chicago, IL, for John D. Terzakis, individually dba Midwest Properties, Willowbrook Restaurant Corporation, an Illinois corporation, Illinois Petroleum Co., an Illinois corporation, Restaurant Development Corporation, an Illinois corporation.

Jeffrey Edward Kehl, Dowd & Dowd, Ltd., Chicago, IL, for John A. Garrity, III, Michael Mullally, Greenscape Landscaping, Inc.

*MEMORANDUM OPINION AND ORDER*

BUCKLO, District Judge.

Plaintiff, Ihor Kleban, has filed suit against numerous defendants. Several of these defendants, namely, S.Y.S. Restaurant Management, Inc. ("S.Y.S."), International Double Drive–Thru, Inc. ("IDDT"), Andrew Sun, John Young, Thomas Singer, John Terzakis, Midwest Properties, John Garrity, Willowbrook Restaurant Corp. ("Willowbrook"), Illinois Petroleum Co. ("IPC"), Restaurant Development Corp. ("RDC"), and Greenscape Landscaping, Inc. ("Greenscape"), have filed various motions to dismiss this complaint. For the reasons stated below, the motions of S.Y.S., IDDT, Mr. Sun, Mr. Young, Midwest Properties, Willowbrook, IPC, RDC, and Greenscape are granted. The motions of Messrs. Terzakis, Singer, and Garrity are granted in part and denied in part.

### Background

Mr. Kleban invested in a limited partnership, Southwest Double Drive–Thru, L.P. ("Southwest Partnership"), which was formed to own and operate Checkers restaurants. Mr. Kleban's investment has lost its value and he blames this loss on the fraud of the defendants. He therefore brought this suit, alleging common law fraud, negligent misrepresentation, and violations of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. § 78j (1981), the Illinois Securities Law of 1953, 815 ILCS 5/1 *et seq.* ("the Illinois Securities Law") (1993), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* (1984).

Mr. Terzakis has filed a motion to dismiss on behalf of himself, Midwest Properties, Willowbrook, IPC, and RDC. Mr. Garrity has filed a motion to dismiss on behalf of himself and Greenscape, joining Mr. Terzakis's arguments. Mr. Singer has also filed a motion to dismiss, joining Mr. Terzakis's arguments. S.Y.S., IDDT, and Messrs. Young and Sun (collectively, "the IDDT defendants") have also filed a motion to dismiss. Mr. Kleban's complaint alleges the following facts, taken as true for purposes of these motions to dismiss. *Bane v. Ferguson,* 890 F.2d 11 (7th Cir.1989).

Checkers Drive–In Restaurants of North America, Inc. is a national franchisor of fast-food restaurants. In November of 1988, it granted the sole and exclusive right to develop, own, and operate Checkers Restaurants in the Chicagoland Area to defendant S.Y.S. S.Y.S. is a corporation owned by defendants Thomas Singer, Andrew Sun, and John Young.

In May of 1990, the three S.Y.S. shareholders entered into a "Joint Development Agreement," through which they agreed to divide the Chicagoland market into two territories. Messrs. Sun and Young formed defendant IDDT, which obtained the right to develop the southern territory, while Mr. Singer formed Chicago Double Drive–Thru, Inc. ("CDDT"), which obtained the right to develop the northern territory.

To facilitate his business venture, on August 22, 1991 Mr. Singer formed the Southwest Partnership. Southwest Partnership had a General Partner and several limited partners, including Mr. Kleban. CDDT, the owner of the right to develop Checkers restaurants in the northern territory, also became a partner of the General Partner of Southwest Partnership.

The other defendants include Mr. Terzakis, an officer and shareholder of CDDT. Mr. Terzakis also "owned, controlled, and/or managed" entities which provided goods and services to CDDT. These entities include the defendants Willowbrook, IPC, RDC, and Midwest Properties. Defendant Garrity was counsel for CDDT and "represented and/or managed" aspects of the Checkers operation. Additionally, both Messrs. Garrity and Terzakis acted as "promoter[s] and marketing agent[s]" of the Checkers operation. Finally, defendant Greenscape, a corporation owned in part by defendant Singer, provided landscaping and maintenance services to the Checkers operation.

Mr. Kleban's involvement with the Checkers operation began in November of 1991 when he received a copy of the Southwest Partnership Private Placement Memorandum ("PPM"). The PPM explains that the South-

west Partnership "was formed to develop, equip, operate, and possibly sell between 1 and 4" Checkers restaurants. The PPM explained the Joint Development Agreement and the fact that IDDT competed with CDDT.

Shortly thereafter, Mr. Kleban began meeting with Mr. Singer, Mr. Terzakis, and others to discuss investment in the Southwest Partnership. At these meetings Messrs. Singer and Terzakis made various misrepresentations to Mr. Kleban regarding the costs associated with building the restaurants, the General Partner's contribution to those costs, and the profit distribution. Additionally, Messrs. Singer and Terzakis promised that the General Partner would not mismanage, misappropriate, or divert partnership funds. In reliance on the representations made in these meetings, on November 25, 1991 Mr. Kleban made a $100,000 limited partnership investment in Southwest Partnership.

Between November 25, 1991 and February 1, 1992, Mr. Kleban received continued assurances from Mr. Singer, Mr. Terzakis, and other defendants that Southwest Partnership was performing well. On February 1, 1992, Mr. Kleban met with Mr. Singer and other defendants. The defendants boasted about the success of the first Checkers Restaurant and the prospects for the entire Checkers operation. Relying on these statements, Mr. Kleban made another investment in Southwest Partnership in the amount of $150,000.

On approximately February 24, 1992, Mr. Kleban again met with Messrs. Terzakis and Singer. These defendants boasted about the success of the Partnership and assured Mr. Kleban that the Checkers restaurants were being developed in accordance with their prior oral representations. On this day, Mr. Kleban made a $287,500 loan to CDDT with an option of converting the loan into a limited partnership interest in Southwest Partnership. Mr. Kleban elected to make this conversion on August 5, 1992.

Between March and July of 1992, Mr. Kleban had further conversations with defendants Singer and Terzakis in which they blamed the partnership's decline on the economy and fierce competition. They again boasted about the success of the operation and reassured Mr. Kleban that the Southwest Partnership was functioning in accordance with the defendants' prior oral representations. On May 21, 1992, Mr. Kleban made another $72,000 limited partnership investment.

In July of 1992, Mr. Kleban met with Mr. Singer, Mr. Garrity, and other defendants. At that meeting, the defendants boasted about the prospects of the Checkers operation and stated that a loan from Mr. Kleban would ensure its continued success and a great return for him. In reliance on those representations, Mr. Kleban loaned CDDT $200,000.

In September of 1993, Mr. Kleban again met with Mr. Singer, Mr. Garrity, and other defendants. At this meeting, the defendants claimed that the imminent sale of CDDT back to the national franchisor would provide Mr. Kleban with an extraordinary return on his investment. They also convinced Mr. Kleban to extend the repayment period of his July, 1992 loan by promising incentives, which were never delivered. Mr. Kleban not only extended the loan repayment, but loaned CDDT an additional $100,000.

Throughout this period, CDDT and Southwest Partnership were improperly managing their money. For example, CDDT was repaying loans made to it and servicing its own leases using Southwest Partnership funds. Additionally, CDDT incurred cost overruns in constructing Checkers restaurants for which it was responsible. Southwest Partnership funds, however, paid those overruns. More generally, the defendants caused Southwest Partnership funds to be mingled with other unrelated business entities, diverted to other accounts, and misappropriated for unrelated expenditures.

Between July and September of 1994, Mr. Kleban demanded several times to examine the corporate books of the Southwest Partnership. Because he was denied access to these books, Mr. Kleban filed suit in the Circuit Court of Cook County on September 19, 1994, seeking mandamus to review the books and records of CDDT. On December

8, 1994, CDDT filed for bankruptcy. On May 18, 1995, Mr. Kleban filed this suit.

### Analysis

■ As an initial matter, the moving defendants contend that Mr. Kleban's complaint must be dismissed for failing to comply with Rule 9(b) of the FEDERAL RULES OF CIVIL PROCEDURE. Rule 9(b) requires a plaintiff to plead "the circumstances constituting fraud ... with particularity." *Id.* Mr. Kleban must therefore " 'state the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.' " *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 777 (7th Cir.1994) (quoting *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992)).

■ Mr. Kleban has met these requirements. He recounts several meetings at which various defendants made verbal misrepresentations and omissions to him regarding his partnership investment. In describing these meetings, Mr. Kleban includes the assertions made at each meeting, the locations and dates of those meetings, and the names of those defendants in attendance at each meeting. Mr. Kleban's complaint therefore adequately informs each defendant of the nature of the claim against that defendant.

### I. The Individual Defendants—Messrs. Singer, Terzakis, and Garrity

Defendants Terzakis, Singer, and Garrity are addressed together because they raise substantially the same issues in their various motions. The corporate entities, in which these defendants are part owners, are discussed later in this opinion.

#### A. The Rule 10b–5 Claim

■ In Count I of his complaint, Mr. Kleban alleges violations of Rule 10b–5, promulgated under § 10(b) of the 1934 Act. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. To establish liability under 10b–5, Mr. Kleban must demonstrate that each defendant

(1) made an untrue statement of material fact or omitted a material fact that rendered the statements made misleading, (2) in connection with a securities transaction, (3) with the intent to mislead, and (4) which caused the plaintiff's loss.

*Schlifke v. Seafirst Corp.*, 866 F.2d 935, 943 (7th Cir.1989).

■ The defendants contend that much of the 10b–5 claim is barred by the statute of limitations. In *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), the Supreme Court applied the one and three-year statute of limitations from section 9(e) of the 1934 Act to 10b–5 claims. Under this section, the plaintiff must file a 10b–5 claim within one-year of the date the facts put the plaintiff on notice that fraud had been committed. 15 U.S.C. § 78i(e). Additionally, the plaintiff must file the claim within "three years after such violation." *Id.*

The parties dispute the date on which the three-year limitations period begins to run. The defendants assert that it begins to run on the date of the alleged misrepresentation or omission. They point to the language in *Lampf*, in which the Court dismissed the plaintiff's complaint because it "was filed more than three years after petitioner's *alleged misrepresentation.*" *Lampf*, 501 U.S. at 364, 111 S.Ct. at 2782 (emphasis added). In contrast, Mr. Kleban contends that it refers to the date of the sale of the security. Mr. Kleban's argument is supported by *Aizuss v. Commonwealth Equity Trust*, 847 F.Supp. 1482 (E.D.Cal.1993). In *Aizuss*, the court used the date the securities were sold in determining the three-year limitations period. I agree with the court's conclusion. Although section 13 explicitly points to the date of the *"sale"* as the beginning of the 3–year period, whereas section 9(e) uses the date of the *"violation"* as the appropriate point, in an action under Rule 10b–5, there must be a purchase or sale of a security in order to have an injury. Accordingly, there is no violation until the transaction takes place. *See Schlifke, supra*, 866 F.2d at 943. For Count I of Mr. Kleban's complaint, I will consider allegations of misrepresentations or omissions taking place prior to May 18, 1992,

if the sales in connection with which the misrepresentations are alleged to have occurred took place on this date or later.[1]

■ Mr. Kleban alleges misrepresentations made by Mr. Terzakis at a series of meetings occurring between March of 1992 and July of 1992. According to Mr. Kleban, at these meetings, Mr. Terzakis "blamed the recent declines [sic] in revenues [of the partnership's] Checkers Restaurant on a general economic downturn, the fierce competition with competitor chains, and construction having not yet been completed [sic]." (Complaint ¶ 48) Mr. Kleban asserts that the real reason for Southwest Partnership's losses was the fraud allegedly perpetrated by some of the defendants whereby Southwest Partnership was wrongfully covering debts of CDDT and improperly commingling funds with other unrelated business entities.

■ For this misrepresentation to be deemed material, " 'there must be a substantial likelihood that [it] would have been viewed by the reasonable investor as having significantly altered "the total mix" of information made available' " to the investor. *Basic, Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)). Whether a misrepresentation or omission is material is a question of fact for the jury. *Rowe v. Maremont Corp.,* 850 F.2d 1226, 1233–34 (7th Cir.1988).[2]

In addition, Mr. Kleban adequately alleges that Mr. Terzakis made this misrepresentation in order to mislead Mr. Kleban and induce him to invest in the Southwest Partnership. Mr. Kleban also alleges that he relied on this misrepresentation in deciding to purchase his interest in the Southwest Partnership and therefore this statement

caused his loss. Mr. Kleban has thus stated a claim against Mr. Terzakis for securities fraud.

According to Mr. Kleban's complaint, Mr. Singer also attended these meetings between March and July of 1992 and misrepresented the source of the partnership's losses. Mr. Kleban has therefore also stated a claim against Mr. Singer.

Mr. Kleban does not allege that Mr. Garrity was at this series of meetings. He does, however, state that at a meeting in July of 1992 Mr. Garrity "touted the tremendous successes of the Checkers investment scheme and stated that a loan would insure [sic] that its success would continue." (Complaint ¶ 51) By alleging the fraudulent practices hindering the Checkers operation, Mr. Kleban has alleged that this statement was false. As in his claims against Messrs. Terzakis and Singer, Mr. Kleban has adequately alleged the other elements of a 10b–5 claim. Mr. Kleban has therefore stated a 10b–5 claim against Mr. Garrity.

*B. Violations of the Illinois Securities Law*

■■ In Count II of his complaint, Mr. Kleban claims that the defendants violated Section 13 of the Illinois Securities Law. That statute permits an injured plaintiff to recover "the full amount paid ... upon tender to the seller or into court of the securities sold." 815 ILCS 5/13 A(1). Rescission is the only remedy available to the purchaser; courts have refused to award damages for violations of the statute. *See Reshal Associates, Inc. v. Long Grove Trading Co.,* 754 F.Supp. 1226, 1236 (N.D.Ill.1990). In order to rescind the security purchase under Section 13, the injured purchaser must provide notice "within 6 months after the pur-

---

1. Mr. Kleban's claims for securities fraud surrounding his investments on November 25, 1991, February 1, 1992, and February 24, 1992; are dismissed.

2. Defendants properly note that because many of the alleged misrepresentations are directly contradicted by the PPM and other offering materials provided to Mr. Kleban, they may not be considered "material." *See Acme Propane, Inc. v. Tenexco, Inc.,* 844 F.2d 1317, 1322 (7th Cir.

1988) ("[D]eceitful statements are not 'material' to the investment decision when the investor has been told the truth; one cannot be deceived by what one knows is false."). I need not address exactly which alleged misrepresentations may have been contradicted by the PPM, however, because Mr. Kleban has alleged at least one misrepresentation which was not contradicted by the PPM. His complaint therefore withstands a motion to dismiss.

chaser shall have knowledge that the sale of securities to him or her is voidable ... by registered mail or certified mail ... addressed to the person to be notified ... or by personal service." 815 ILCS 5/13 B.

The parties dispute the date on which Mr. Kleban became aware of the voidability of his purchase of an interest in the Southwest Partnership. Mr. Kleban contends that it was not until "after CDDT's bankruptcy" that he became aware of the voidability of the sale. He does not explain why the bankruptcy of CDDT triggered this knowledge, but merely proposes the bankruptcy date as the appropriate one.[3] The defendants argue, however, that Mr. Kleban had the requisite knowledge by at least September of 1994, when he filed suit in state court seeking mandamus to review CDDT's books. Attached to that complaint were two letters Mr. Kleban's attorney sent to Mr. Singer and CDDT when requesting to examine the records of CDDT and Southwest Partnership.[4] In these letters, dated July 18, 1994, and August 3, 1994, Mr. Kleban's counsel laid out the factual allegations underlying this complaint. For example, the July 18, 1994 letter complains, *inter alia*, about (1) the liability of the general partner for cost overruns associated with constructing the restaurants; (2) improper loans that had been incurred by CDDT and fraudulent encumbrances of Partnership assets; (3) the commingling of partnership assets; and (4) the leasing by the Partnership of land for the restaurants from affiliates at excessive rates.

As these letters make clear, by September of 1994 Mr. Kleban had retained an attorney to help him resolve the issues regarding the alleged fraud by the defendants. Additionally, he had knowledge of the necessary facts to determine whether CDDT or the Southwest Partnership had violated Section 13. Cf. *Buehl v. Dayson*, 127 Ill.App.3d 958, 82

Ill.Dec. 869, 874, 469 N.E.2d 403, 408 (5th Dist.1984) ("A purchaser will not be held to know the voidable nature of his transaction merely because he consulted with an attorney if that consultation involved an unrelated matter or if the purchaser learns only that the transaction went sour and that he lost his investment.") (citations omitted). Mr. Kleban therefore had six months from that time to inform CDDT of his election to rescind the partnership agreement. Because Mr. Kleban did not do so, this claim must be dismissed.

### C. Common Law Fraud

■ To state a claim for common-law fraud, Mr. Kleban must allege:

(1) a false statement of material fact; (2) the party making the statement knew or believed it to be untrue; (3) the party to whom the statement was made had a right to rely on the statement; (4) the party to whom the statement was made did rely on the statement; (5) the statement was made for the purpose of inducing the other party to act; and (6) the reliance by the person to whom the statement was made led to that person's injury.

*Siegel v. Levy Organization Development Co.*, 153 Ill.2d 534, 180 Ill.Dec. 300, 304, 607 N.E.2d 194, 198 (1992).

■ The defendants argue that Mr. Kleban has not properly alleged each of these elements. Mr. Kleban has, however, adequately described the fraudulent scheme and each of the three moving individual defendants' part in it. The misrepresentations alleged in Mr. Kleban's securities fraud claim also support his common law fraud claim. Moreover, Mr. Kleban alleges that Messrs. Terzakis, Garrity, and Singer acted with reckless disregard for whether these statements were true, that he reasonably relied on those statements, that the defendants

---

**3.** In fact, Mr. Kleban does not acknowledge the notice requirement in his complaint at all. This failure to plead that the notice requirement was fulfilled is itself grounds for dismissing his claim. See, e.g., *Wislow v. Wong*, 713 F.Supp. 1103, 1107 (N.D.Ill.1989) (dismissing complaint where plaintiff failed to plead compliance with the notice provision).

**4.** Because these letters were attached to Mr. Kleban's state court complaint, they are a matter of public record and I may take judicial notice of them in deciding this motion to dismiss. See *Henson v. CSC Credit Services*, 29 F.3d 280 (7th Cir.1994) ("The district court properly considered the public court documents [filed in an earlier state court case] in deciding the defendants' motion to dismiss.").

wanted to induce Mr. Kleban to invest in order to get more money for CDDT and the Southwest Partnership, and that by relying on these statements he made the investment and thereafter lost it. Mr. Kleban has stated a claim for fraud against each of these three individual defendants.

### D. Negligent Misrepresentation

▆ To hold the defendants liable for negligent misrepresentation, Mr. Kleban must demonstrate that each defendant (1) made a negligent misrepresentation of a material fact; (2) is in the business of providing investment information; and (3) made the misrepresentation while guiding Mr. Kleban in his "business relations with *third* parties." *Rankow v. First Chicago Corp.*, 870 F.2d 356, 362–63 (7th Cir.1989) (quoting *Black, Jackson and Simmons Insurance Brokerage, Inc. v. International Business Machines Corp.*, 109 Ill.App.3d 132, 64 Ill.Dec. 730, 732, 440 N.E.2d 282, 284 (1st Dist.1982)) (emphasis in both originals).

▆ Mr. Kleban alleges that he dealt directly with Messrs. Terzakis, Singer, and Garrity. His claim is that these defendants made misrepresentations in order to induce Mr. Kleban to deal with *them*. These defendants are not "third parties." Count IV of Mr. Kleban's complaint will therefore be dismissed as to all moving defendants. *See Black, Jackson and Simmons, supra,* 64 Ill. Dec. at 732, 440 N.E.2d at 284 (dismissing claim where plaintiffs bought computer from defendant who could not then also be a third party).

### E. Violations of RICO

▆ Mr. Kleban contends that Messrs. Garrity, Singer, and Terzakis have violated § 1962(c) of RICO.[5] To state a claim under this section, Mr. Kleban must allege conduct of an enterprise through a pattern of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105

S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). To satisfy the pattern requirement, Mr. Kleban must fulfill the "continuity plus relationship" test by showing two or more predicate acts that are related to one another and pose a threat of continued criminal activity. *Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1022 (7th Cir.1992) (citing *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 2900–2901, 106 L.Ed.2d 195 (1988)).

To support his RICO claim, Mr. Kleban alleges several different acts of securities, mail, and wire fraud. These actions were all part of a single scheme—the Southwest Partnership venture, which has apparently now ended. To recover under RICO, therefore, Mr. Kleban must demonstrate that the wrongful conduct "endur[ed] a 'substantial period of time' ... [so that it] carries with it an implicit threat of continued criminal activity in the future." *Midwest Grinding, supra,* 976 F.2d at 1022–23 (quoting *H.J. Inc., supra,.* 492 U.S. at 242, 109 S.Ct. at 2902).

▆ In determining whether RICO liability should result from allegations that the fraud is likely to recur, the Seventh Circuit advocates a multifactor continuity test. *Midwest Grinding, supra,* 976 F.2d at 1023–24. Thus I must consider "the duration of time over which the predicate acts were committed, the number and variety of predicate acts, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries." *Id.* at 1024. Mr. Kleban alleges a single scheme—the Southwest Partnership venture. Additionally, his complaint does not point to any other victims of the fraudulent scheme.[6] And although Mr. Kleban alleges several different purchases of an interest in the partnership, these separate investments do not constitute "distinct injuries." The only injury Mr. Kleban suffered at the hands of the defendants was the loss of his investment in the partnership. The fact that he made this investment in install-

---

5. In his complaint, Mr. Kleban alleged violations of §§ 1962(b) and (c). In response to the defendants' motion to dismiss, Mr. Kleban has agreed to dismissal of his claim under § 1962(b).

6. The Checkers organizational chart attached to Mr. Kleban's complaint does contemplate other investors who were limited partners in the Southwest Partnership. Nowhere in his complaint, however, does Mr. Kleban contend that these other investors were similarly defrauded.

ments should not alter this conclusion.[7] Thus although the Checkers operation lasted over three years and the defendants allegedly committed securities fraud several times, I find the continuity requirement not fulfilled. *See United States Textiles, Inc. v. Anheuser–Busch Co.,* 911 F.2d 1261, 1269 (7th Cir.1990) ("If the concern is 'continuity,' however, and the price for that 'continuity' is treble damages, costs and reasonable attorneys fees, a natural and common sense approach to the pattern element of RICO would instruct that identical economic injuries suffered over the course of two years stemming from a single contract were not the type of injuries which Congress intended to compensate via the civil provisions of RICO.").

## II. The Corporate Defendants—Midwest Properties, Willowbrook, IPC, RDC, and Greenscape Landscaping

■■■ To hold these defendants liable for the torts committed by their principals, Mr. Kleban must establish that the wrongful acts were (1) committed in the scope of the wrongdoer's employment; (2) committed for the benefit of the corporation; and (3) authorized or subsequently ratified by the corporation. *Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1306 (7th Cir.1987), *cert. denied,* 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989). Mr. Kleban's allegations do not support a claim against the corporation.

Mr. Kleban does allege that Mr. Terzakis "owned, controlled, and/or managed" Willowbrook, MPI, IPC, and RDC and that these entities "provided goods, services, and loans to" the Checkers operation. (Complaint ¶ 10) He explains in greater detail exactly what services each of these defendants provided to the Checkers operation, but nowhere does he state that Mr. Terzakis acted on their behalf when making the misrepresentations to Mr. Kleban. Mr. Kleban has therefore not alleged the prerequisites to

hold these defendants liable for Mr. Terzakis's actions, and the complaint against them is dismissed.

For the same reason, the complaint is dismissed as to Greenscape. Mr. Kleban alleges that Greenscape is owned, in part, by defendants Singer and Tedesco. (Complaint ¶ 22) He further alleges that Greenscape provided services to the Checkers operation. He does not, however, allege that Messrs. Singer or Tedesco acted on behalf of Greenscape when making their misrepresentations.

## III. The IDDT Defendants

■■■ In response to the Motion to Dismiss filed by the IDDT Defendants, Mr. Kleban voluntarily dismissed Counts II through V as to them. The only remaining claim alleges violations of Rule 10b–5. The IDDT defendants contend that this claim must be dismissed because Mr. Kleban does not allege any misrepresentations or omissions by them. In response, Mr. Kleban argues that they are liable as control persons under Section 20 of the Act.[8]

■■■ To determine whether the IDDT defendants may be held liable as control persons, the court must examine whether they "actually participated in, that is, exercised control over, the operations of the [wrongdoer(s)] in general." *Harrison v. Dean Witter Reynolds, Inc.,* 974 F.2d 873, 881 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2994, 125 L.Ed.2d 688 (1993). Additionally, the court must consider "whether [the wrongdoers] possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Id.*

Mr. Kleban's complaint itself shows that the IDDT defendants had no control over the actions of Mr. Singer, CDDT, or any of the other defendants associated with the Check-

---

7. In his response brief, Mr. Kleban attempts to characterize his injuries as "the loss of seven separate sums of money at seven different times." Mr. Kleban may have made seven separate investments in the Checkers operation, but he did not lose this money until his interest in the Southwest Partnership actually lost its value.

8. 15 U.S.C. § 78t(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable."

ers operation. According to Mr. Kleban's complaint, "CDDT was the *sole* controlling entity of the Checkers investment scheme and SOUTHWEST PARTNERSHIP." (Complaint ¶ 69D) (emphasis added). In his response to the IDDT defendants' motion, Mr. Kleban points to earlier portions of his complaint alleging control by the IDDT defendants. For example, in one paragraph, Mr. Kleban alleges that "upon information and belief ... [Mr. Sun] controlled, managed, oversaw, and/or supervised the Checkers investment scheme." (Complaint ¶ 7). Mr. Kleban, however, may not create an inconsistency in his complaint and then direct the court to only those particular portions which aid his argument at that moment.

More importantly, Mr. Kleban may not escape the Joint Development Agreement in which Messrs. Sun, Young, and Singer agreed to divide the Chicago area for Checkers development and become competitors.[9] Under this agreement, S.Y.S. transferred all of its "rights, duties and obligations" to CDDT and IDDT. The PPM which Mr. Kleban signed and attached to his complaint states that IDDT, with Messrs. Sun and Young as principals, was a competitor of CDDT. Mr. Kleban makes no attempt to explain how a competitor of CDDT would retain control over its actions. Accordingly, the IDDT defendants are not liable as controlling persons under Section 20 and the complaint against them will be dismissed.

### Conclusion

For the reasons stated above, the complaint against S.Y.S., IDDT, Mr. Sun, Mr. Young, Midwest Properties, Willowbrook, IPC, RDC, and Greenscape is dismissed. Counts II, IV, & V are dismissed as to Messrs. Terzakis, Singer, and Garrity.

---

**9.** The agreement attached to the complaint is dated in 1993, after some of the relevant conduct may have occurred. In his complaint, however, Mr. Kleban states that the attached 1993 agreement is simply the most recent version of their agreement, with prior agreements and the decision to split S.Y.S. dating back to 1990, long before any conduct which could serve as a basis for liability occurred.