## In re RIBOZYME PHARMACEUTICALS, INC. SECURITIES LITIGATION

**This Document Relates to: All Actions**

**No. 99–B–2235.**

United States District Court, D. Colorado.

July 20, 2001.

**574**

Robert F. Hill, John F. Walsh, III, Jennifer H. Hunt, Hill & Robbins, P.C., Denver, CO, Edward Korsinsky, Russell H. Beatie, Daniel A. Osborn, LLP, New York City, Harold B. Obstfeld, Harold B. Obstfeld, PC, New York City, for Mark P. Adler.

Frederick J. Baumann, Scott Mark Browning, Rothgerber, Johnson & Lyons, LLP, Denver, CO, David M. Furbush, Brobeck, Phleger & Harrison, Palo Alto, CA, Boris Feldman, Douglas J. Clark, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, for Ribozyme Pharmaceuticals, Inc. and Ralph E. Christoffersen.

### ORDER

BABCOCK, Chief Judge.

In this securities action, Lead Plaintiffs, Mark P. Adler, H. Mitchell Gilbert and Jacqueline Jackson ("Plaintiffs") move, pursuant to Fed.R.Civ.P. 23, for class certification. Defendants do not oppose class certification but do oppose Plaintiffs' proposed class definition. The motion is adequately briefed, and the parties presented oral argument on July 20, 2001. For the reasons set forth below, I grant Plaintiffs' motion but have altered their proposed class definition. Jurisdiction exists under 28 U.S.C. § 1331.

### I. BACKGROUND

Defendant Ribozyme is a Delaware corporation with its principal executive offices in Colorado. Defendant Ralph E. Christoffersen resides in Colorado, and has been the Chief Executive Officer, President, and Director of Defendant Ribozyme since 1992.

Plaintiffs propose a class consisting of all persons who purchased or otherwise acquired the common stock of Defendant Ribozyme Pharmaceuticals, Inc. ("Ribozyme") between the close of trading on November 15, 1999, and the close of trading on November 17, 1999. Defendants argue that the class should be limited to only those persons who purchased or otherwise acquired the stock between the opening of trading on November 16, 1999, and the time on that date when the market became aware that all relevant news had been disclosed. Defendants believe that time was 11:34 a.m. In the alternative, Defendants argue that, at the very least, the class period should close at the end of trading on November 16, 1999.

Defendant Ribozyme is developing a new class of drugs containing ribozymes, a form of ribonucleic acid, to treat or prevent human disease. One of those drugs, Angiozyme, is being developed in collaboration with Chiron Corporation. Angiozyme is designed to inhibit the production of a protein essential to angiogenesis, the process by which new blood vessels are formed. Because cancerous tumors rely on a supply of blood to develop and metastasize, it is hoped that Angiozyme will inhibit the growth of new blood vessels surrounding such tumors, and thereby restrict or halt the development, or spread of certain types of cancer in individuals suffering from the disease.

In its Form 10-K covering the period ending on December 31, 1998 and filed with the Securities and Exchange Commission on May 7, 1999, Defendant Ribozyme summarized the U.S. Government regulations governing the process by which new drugs receive approval by the Food and Drug Administration (FDA):

Before testing of any agents with potential therapeutic value in healthy human test subjects or patients may begin, stringent government requirements for preclinical data must be satisfied. The data, obtained from studies in several animal species, as well as from laboratory studies, are submitted in an IND application or its equivalent in countries outside the United States where clinical studies are to be conducted. The preclinical data must provide an ade-

quate basis for evaluating both the safety and the scientific rationale for the initiation of clinical trials.

Clinical trials are typically conducted in three sequential phases, although these phases may overlap. In Phase I, which frequently begins with initial introduction of the compound into healthy human subjects prior to introduction into patients, the product is tested for safety, adverse effects, dosage, tolerance, absorption, metabolism, excretion and clinical pharmacology. Phase II typically involves studies in a small sample of the intended patient population to assess the efficacy of the compound for a specific indication to determine dose tolerance and the optimal dose range as well as to gather additional information relating to safety and potential adverse effects. Phase III trials are undertaken to further evaluate clinical safety and efficacy in an expanded patient population at geographically dispersed study sites to determine the overall risk-benefit ratio of the compound and to provide an adequate basis for product labeling....

Data from preclinical and clinical trials are submitted to the FDA as an NDA for marketing approval and to other health authorities as a marketing authorization application. The process of completing clinical trials for a new drug is likely to take a number of years and requires the expenditure of substantial resources....

*Defendants' Request for Judicial Notice,* Ex. A at 18. As to where in the process Angiozyme stood as of December 31, 1998, Defendant Ribozyme stated that it "ha[d] commenced Phase Ib clinical trials testing safety and tolerability in approximately 16 cancer patients with a broad spectrum of solid tumors and metastasis.... [and] expect[ed] to initiate Phase II clinical trials prior to the end of 1999." *Id.,* Ex. A at 7.

On August 11, 1999, Defendant Ribozyme issued a press release indicating that it had successfully completed the Phase Ia and Ib trials, and that it was "preparing to enter multi-dose Phase I/II clinical trials in Q4 1999." *Id.,* Ex. C at 2. The press release also stated that "studies at several independent centers have demonstrated significant inhibi-

tion of both growth and metastases in preclinical trials." *Id.,* Ex. C at 1. Finally, the press release included accounts by Dr. Nassim Usman, Vice President of Research at Defendant Ribozyme "and Angiozyme program director" that Angiozyme "completely inhibited metastases in a clinically relevant colorectal cancer model," and "halt[ed] tumor growth and metastases in a Lewis Lung murine model." *Id.*

On November 15, 1999, Defendant Ribozyme issued a "Media Advisory" entitled "Colorado Pharmaceutical Co. Makes Cancer Drug History" announcing a press conference scheduled for November 17, 1999. The Media Advisory stated in part:

> [Defendant Ribozyme] presently has several drug compounds in development, of these Angiozyme-it's cancer drug-has made significant progress. Angiozyme is now in human clinical trials at the Cleveland Clinic Foundation and has taken an important step forward ... making both clinical history and industry news. [At the November 17, 1999 press conference, Defendant] Christoffersen, Ph.D., and other senior RPI staff, will explain Angiozyme and its recent history-making leap, an achievement which may be of great significance to cancer patients everywhere.

*Id., Ex. D.* On November 16, 1999, the price of a share of stock in Defendant Ribozyme traded on NASDAQ opened at $13.625 after closing on November 15, 1999 at $10.0625. The price then rose to $22 within one hour and twenty-five minutes. Defendant Ribozyme became concerned that undue speculation was occurring, and temporarily halted trading. During the halt, Maurice Wolin, vice president of medical affairs for Chiron Corporation (Chiron), stated both that "[w]e don't know if we're going to break ground here or not," and he "doesn't expect any major cancer-drug history to be made since it's too early to say whether the drug works in humans." *Complaint* ¶ 38. Later on November 16, 1999, Shari Annes, vice president of corporate communications at Chiron, stated that the Media Advisory was "very overstated," and "[t]here is always pressure [on small biotechnology companies] when any-

thing good happens, no matter how small, to make it into big news." *Id.*

Also during the halt in trading, at approximately 11:34 a.m., Defendant Ribozyme issued a press release ("the 11:34 a.m. press release") indicating that Angiozyme had entered Phase I/II testing as predicted by the May 7, 1999 Form 10–K and the August 11, 1999 press release.

At 12:29 p.m., shortly after trading resumed, the Bloomberg news service reported that Ribozyme had "released its news ahead of the conference, citing the stock reaction." *Defendants' Response, Exhibit 1, Mayer Affidavit.* After the close of trading on NASDAQ, Bloomberg news service issued another report, quoting Defendant Christoffersen as stating that the press release issued earlier in the day had disclosed all of the material information Defendant Ribozyme intended to reveal at the planned November 17, 1999 press conference. At the close of trading on November 16 and 17, 1999, the price of Defendant Ribozyme's stock was $12.25 and $9.3125, respectively.

According to Lead Plaintiffs, the Bloomberg articles issued on November 16, 1999, did not cure the confusion created by the November 15, 1999 Media Advisory. Lead Plaintiffs point out, in their supplemental filing, that on the morning of November 17, 1999, three local newspapers contained articles which provided readers with different versions of the Ribozyme story. The Rocky Mountain News and the Boulder Daily Camera both quoted a Chiron official as saying that Ribozyme's statement that it would disclose "history-making" progress in developing its cancer drug was premature. However, neither of these articles quoted Dr. Christoffersen as saying that there would be no additional news. The Denver Post article, on the other hand, did quote Dr. Christoffersen as stating that all the material information had already been released. Lead Plaintiffs argue that the differences between these articles show the confusion even among sophisticated financial journalists as to the nature of Ribozyme's press announcements.

Between November 19, 1999 and January 5, 2000, four separate class action complaints were filed with this court claiming in essence that the information contained in the November 15, 1999 Media Advisory was misleading and/or false, and artificially raised the price of Ribozyme shares on November 16, 1999. On January 25, 2000, I consolidated all four cases into this case. On May 30, 2000, the proposed Lead Plaintiffs filed a *Consolidated Complaint* alleging the following claims for relief: violation of § 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder; and violation of § 20(a) of the Exchange Act against Defendant Christoffersen. As support for these claims, Plaintiffs allege in essence both that the November 15, 1999 Media Advisory misrepresented how far in the FDA approval process Angiozyme had progressed, and the 11:34 a.m. Press Release on November 16, 1999 failed to specify that the information contained therein was all that would be discussed at the scheduled November 17, 1999 press conference. On July 6, 2000, Plaintiffs moved for class certification.

## II. STANDARD

" 'A court has broad discretion in deciding whether to allow the maintenance of a class action.' " *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 380 (D.Colo.1993)(quoting 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, supra § 1785 at 119). Certification is not irreversible and may be altered or amended as the case progresses towards resolution on the merits. Fed. R.Civ.P. 23(c)(1), 23(c)(4)(B). Because of the power to change the class certification decision, many courts tend to be quite liberal in certifying a class when that decision is made at an early stage, noting that the action always can be decertified or the class description altered if later events suggest that it is appropriate to do so. *Esplin v. Hirschi,* 402 F.2d 94, 99 (10th Cir.1968); *Cook,* 151 F.R.D. at 380.

" 'An inquiry into the merits of the claims of the representative or the class is inappropriate when making the decision whether the action should be certified under Rule 23.' " *Cook,* 151 F.R.D. at 380 (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 1759 at 99 (1986)); *see also Eisen v. Car-*

*lisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Redditt v. Mississippi Extended Care Centers, Inc.,* 718 F.2d 1381, 1387–88 (5th Cir.1983); *Joseph v. General Motors Corp.,* 109 F.R.D. 635, 637 (D.Colo.1986). A court is obliged to determine only whether the requirements of Rule 23 have been satisfied. *Cook,* 151 F.R.D. at 380; *Kahan v. Rosenstiel,* 424 F.2d 161, 169 (3d Cir.), *cert. denied,* 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970). However, in determining whether the requirements of Rule 23 have been met, it is often necessary to analyze the substantive claims and defenses of the parties and the essential elements of those claims and defenses. *Cook,* 151 F.R.D. at 380. There is a distinction, though, between identifying the issues that the case will present for purposes of determining whether the requirements of Rule 23 have been met and deciding those issues on the merits. *See id.*

### III. DISCUSSION

In general, class actions are the favored method of litigating securities fraud actions in which numerous plaintiffs are involved. *See Schwartz v. Celestial Seasonings, Inc.,* 178 F.R.D. 545, 550 (D.Colo.1998) (citation omitted). The party invoking Rule 23 has the burden of showing that all of the prerequisites to utilizing the class action procedure have been satisfied. *Taylor v. Safeway Stores, Inc.,* 524 F.2d 263, 270 (10th Cir.1975); *Cook,* 151 F.R.D. at 380.

First, Plaintiffs must first establish that the four requirements of Fed.R.Civ.P. 23(a) are satisfied. These requirements are: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a). These requirements are often referred to as numerosity, commonality, typicality, and adequacy of representation.

Second, Plaintiffs must establish that the case fits within one of the three subcategories of Rule 23(b). Here, Plaintiffs seek certification under Rule 23(b)(3). Under subsection (b)(3), Plaintiffs must establish that questions of law and fact common to the class predominate over any questions affecting only individual members (predominance), and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy (superiority). Fed.R.Civ.P. 23(b)(3).

Defendants do not argue that the requirements of 23(a) and 23(b)(3) are lacking in this case; they merely oppose the broad definition of the Plaintiffs' proposed class. Nevertheless, I must independently determine that a class action is appropriate. *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *In re Intelcom Group, Inc.,* 169 F.R.D. 142, 147 (D.Colo.1996).

### A. 23(a) Requirements

#### 1. Numerosity

To establish the numerosity requirement, Plaintiffs need only define the class adequately and then establish that the class is so numerous that joinder of all members is impractical. *Schwartz v. Celestial Seasonings, Inc.,* 178 F.R.D. 545, 550 (D.Colo.1998); *Cook,* 151 F.R.D. at 380. Courts generally assume that the numerosity requirement is met in cases involving nationally traded securities. *See In re Intelcom Group, Inc.,* 169 F.R.D. 142, 148 (D.Colo. 1996). Here, Plaintiffs have defined the proposed class as "all persons who purchased or otherwise acquired the common stock of Ribozyme Pharmaceuticals, Inc. between the close of trading on November 15, 1999 and the close of trading on November 17, 1999." Defendant argues that the appropriate class should be limited to those persons who purchased or otherwise acquired the stock between the opening of trading on November 16, 1999 and 11:34 a.m. Eastern time on the same day. Even if the class was limited as the Defendants propose, the class would still be so numerous that joinder of all members would be impractical.

Neither party provides the exact number of people included in their proposed class. However, given the activity of the security at

issue, the class would be numerous. The stock is traded on NASDAQ and millions of shares of stock were outstanding during the time period at issue. The stock was owned by hundreds, if not thousands, of shareholders. During the entire day of November 16, 1999, the stock's volume of trading was 4,789,000 shares. Further, the shareholders are so geographically dispersed that joinder is impracticable. Thus, even if the Defendants' limited class is accepted, the numerosity requirement is satisfied.

## 2. Commonality

The commonality requirement is satisfied if there are questions of law or fact common to the class. Fed.R.Civ.P. 23(a)(2). This does not require that the injuries of all class members be identical; "only the harm complained of must be common to the class." *Schwartz*, 178 F.R.D. at 551.

Here, the questions common to the class include: (1) whether the Defendants' false and misleading statements violated the federal securities laws; (2) whether Defendants participated in and pursued the common course of conduct alleged in the Complaint; (3) whether documents, press releases and other statements disseminated to investors during the class period were, due to the omission of other material facts, materially inaccurate regarding the prospect of Ribozyme and its products; (4) whether Defendants acted willfully or recklessly in misrepresenting and/ or omitting to state material facts; and (5) whether the market price of Ribozyme shares during the class period was artificially inflated due to the misrepresentations and/ or non-disclosures. Accordingly, the commonality requirement is satisfied.

## 3. Typicality

Next, the claims or defenses of the representative parties must be typical of the claims or defenses of the class. Fed.R.Civ.P. 23(a)(3). Here, the typicality requirement is satisfied because the claims brought by the Lead Plaintiffs arise out of the same course of conduct by Defendants and rest on exactly the same legal theory, securities fraud, as those of the potential class members.

## 4. Adequacy of Representation

Finally, the class representatives must adequately represent the class. The criteria for assessing whether the Lead Plaintiffs will adequately represent the class include whether they have common interests with the members of the potential class and whether they will vigorously prosecute the interests of the class through qualified counsel. *Schwartz*, 178 F.R.D. at 552; *Cook*, 151 F.R.D. at 386. In addition, the Lead Plaintiffs should be "knowledgeable as to the status and underlying legal basis for the action, that they are willing and able to pay notification and other costs, that they will diligently pursue their claims, and that their interests are not antagonistic to the interests of the class." *Schwartz*, 178 F.R.D. at 553 (quoting *In re Storage Tech. Corp. Secs. Litig.*, 113 F.R.D. 113, 118 (D.Colo.1986)).

Previously, on May 1, 2000, I issued an order designating Lead Plaintiffs and Lead Counsel in this case. Before issuing that order, I considered the Lead Plaintiffs' qualifications and the qualification of class counsel. In addition, I reviewed detailed declarations submitted by the Lead Plaintiffs regarding their willingness and ability to act as class representatives. As such, I am convinced that the adequate representation requirement for class certification is satisfied.

## B. Requirements of 23(b)(3)

Next, I determine if Fed.R.Civ.P. 23(b)(3) is satisfied. That rule allows a class action if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). When addressing this analysis, my inquiry is directed primarily toward liability. *See Queen Uno Ltd. P'ship. v. Coeur D'Alene Mines Corp.*, 183 F.R.D. 687, 695 (D.Colo.1998)(citing *Genden v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 114 F.R.D. 48, 52 (S.D.N.Y. 1987)). As the commonality analysis above makes clear, there are numerous common issues of law and fact in this case. In fact, it

seems that the liability issues are identical to all members of the class. The common issues thus predominate over the individual issues.

■ Likewise, the class action device is a superior vehicle for adjudicating this case. Securities fraud actions of this type involve geographically disbursed plaintiffs and involve such costs that if this litigation was not brought via class action, the costs of litigation would likely outweigh any benefit obtained. Through the class action device, I will be able to manage the issues effectively and efficiently and ensure a speedy resolution to all issues involved.

### C. Class Definition

Finally, I address Defendants' only stated opposition to the motion for class certification: the definition of the proposed class. Defendants argue that the class period should end at 11:34 a.m. Eastern time on November 16, 1999—instead of the end of trading on November 17, 1999 as Plaintiffs propose. Plaintiffs argue that Defendants' efforts to limit the class period is inappropriate at this stage because it is an inquiry into the merits. Further, Plaintiffs maintain that the press release issued at 11:34 a.m. Eastern time on November 16, 1999 did not "cure" the earlier false and misleading statements.

■ In a securities class action based on material misrepresentations and omissions to the investing public, the class period should end when curative information is publicly announced or otherwise effectively disseminated to the market. *See Sherin v. Gould,* 115 F.R.D. 171, 174 (E.D.Pa.1987); *In re AM Int'l Secs. Litig.,* 108 F.R.D. 190, 194 (S.D.N.Y.1985); *In re Data Access Sys. Secs. Litig.,* 103 F.R.D. 130, 143–44 (D.N.J.1984); *McFarland v. Memorex Corp.,* 96 F.R.D. 357, 364 (N.D.Cal.1982); *In re LTV Secs. Litig.,* 88 F.R.D. 134, 147 (N.D.Tex.1980). "At that point, subsequent purchasers are charged with knowledge of the true state of business affairs, and thus common questions of law or fact arising from the misrepresentations or omissions do not predominate as to those subsequent purchasers, who are therefore excluded from the class." *In re Kir-*

schner Med. Corp. Secs. Litig., 139 F.R.D. 74, 82 (D.Md.1991).

■ Where the parties dispute whether a particular release cured prior misrepresentations, courts must tread a fine line. In such situations:

> the court is presented with a somewhat mystifying conundrum. *Eisen [v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)] teaches that a court may not look at the merits when determining a class certification motion, yet a court must evaluate some aspects of the merits of plaintiffs' class period to determine the proposed class period.

*In re Data Access Sys.,* 103 F.R.D. at 143. The majority of courts have coped with this dilemma by determining whether there is "a substantial question of fact as to whether the release had cured the market or was itself misleading." *Friedlander v. Barnes,* 104 F.R.D. 417, 421 (S.D.N.Y.1984) (citations omitted); *see also Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 572 (2d Cir.1982)(noting there was a substantial question of fact for the jury whether the December 1970 press release had cured the market); *In re Intelcom Group, Inc.,* 169 F.R.D. 142 (D.Colo. 1996); *In re LTV Secs. Litig.,* 88 F.R.D. 134 (N.D.Tex.1980)(finding a substantial question of fact as to the beginning date of the class, but as to the ending date of the class, concluding that there was no substantial question that persons who purchased after a press release were members of a different class than those who had purchased pre-press release); *In re Memorex Sec. Cases,* 61 F.R.D. 88 (N.D.Cal.1973). When such a substantial question exists, then the broader time period will be certified. *Id.* In essence, the test is a preliminary merits determination whether the facts which underlie the gravamen of the plaintiff's complaint continue to represent a reasonable basis on which an individual purchaser or the market would rely. *In re Data Access Sys.,* 103 F.R.D. at 143.

For example, in *In re LTV Securities Litigation,* plaintiffs alleged that the overvaluation of the inventory of J & L Steel, defendant's subsidiary, in a number of pub-

lic documents, had artificially inflated the market price of defendant's securities. *In re LTV Secs. Litig.,* 88 F.R.D. at 147. Over plaintiffs' objection, the court ended the class period on the date defendant began a 10 day halt in the trading of its stock and issued a press release stating that adjustments to J & L's inventory value " 'would have a materially adverse impact on the reported results of the operations of J & L Steel and of LTV.' " *Id.* The court concluded that the press release had clearly alerted the market to the overvaluation of J & L's inventory and the strong market reaction to the press release proved that it had absorbed the information. *Id.* Thus, post-press release purchasers had not bought in an inflated market, and were therefore not part of a class whose claim for relief depended upon a "fraud on the market" theory. *Id.* at 147–48.

On the other hand, in *In re Intelcom Group,* the court found a substantial question of fact as to whether the press release at issue cured the market or was itself misleading because, among other things, it failed to disclose that the company would replace its CEO or that it would have to postpone its planned $150–$200 million debt offering. *In re Intelcom Group,* 169 F.R.D. at 151.

### 1. *November 16, 1999 press release at 11:34 a.m.*

■ Here, a reasonable dispute exists as to the curative effect of Ribozyme's 11:34 a.m. press release. Plaintiffs argue that it did not cure the market because it: (1) did not state that it contained all the information to be released at the November 17 press conference; (2) did not even mention the November 15 Media Advisory; and (3) did not disclose to investors that the Media Advisory had contained false and misleading information. *Plaintiffs' Reply* at 5. Defendants submitted a report by their expert advising that the class period should end at 11:34 a.m. on November 16, 1999. *Defendants' Response, Exhibit 1, Mayer Affidavit.* The report notes that on November 16, 1999, the volume weighted average price of Ribozyme stock fell from $16.43 during the last pre halt minute of trading (10:49 a.m.) to $12.29 during the eight post halt minute (12:27 p.m.). *Id.* Additionally, the report emphasized that trading in Ribozyme stock was halted at the Company's request and "[t]he purpose and predictable effect of a halt is to command attention to the issuer's next utterance and give the market an opportunity to assimilate that information before trading resumes." *Id.* Both parties have presented persuasive arguments and, therefore, I conclude that there is a substantial question of fact as to whether this press release cured the market. Thus, at this stage of the proceeding, I will not close the class at 11:34 a.m. on November 16, 1999.

### 2. *November 16, 1999 press release after close of trading*

■ Next, Defendants argue that, at the very least, the market was cured when Bloomberg issued an article after the close of trading on November 16, 1999, quoting Dr. Christoffersen as stating that the November 16 press release had disclosed all the material information to be discussed at the November 17 press conference. Plaintiffs argue that although the article contained potentially curative information, there is no proof that the market immediately and effectively absorbed the information because the stock price continued to drop throughout the day on November 17. Additionally, Plaintiffs contend that the statement by Christoffersen—which was buried many paragraphs into the middle of a lengthy Bloomberg article—did not cure the market because many—if not most investors never saw the Bloomberg article.

Plaintiffs are suing under the "fraud-on-the-market" theory. Under this theory, the plaintiff is relieved of proving the element of direct reliance. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 241–50, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). " 'The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.' " *Basic, Inc. v. Levinson,* 485 U.S. 224, 241–42, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)(quoting *Peil v. Speiser,* 806 F.2d 1154,

1160–61 (3d Cir.1986)). The theory "recognizes that most investors rely on the market to evaluate information for them, rather than on their own independent analysis of a stock's value." *In re Convergent Technologies Secs. Litig.,* 948 F.2d 507, 512 n. 2 (9th Cir.1991). The elements giving rise to the reliance presumption under the theory are: (1) material misrepresentations; (2) made public; (3) in an impersonal, efficient market. *Basic,* 485 U.S. at 248, 108 S.Ct. 978.

Here, Plaintiffs are in an uncomfortable situation. They allege that the impersonal, efficient market reacted to the material misrepresentation made public on November 15, 1999. At the same time they contend that the market was inefficient because it failed to notice the potentially curative article released to the public by Bloomberg on November 16, 1999. Plaintiffs cannot maintain that the market was efficient regarding the misrepresentations but somehow became inefficient regarding the curative article. It is significant that trading halted at 11:34 a.m. on November 16, 1999. There is no substantial question that the Bloomberg article issued after the close of trading on November 16, 1999, which disclosed that all of the information alluded to in the November 15, 1999 Media Advisory had already been released, cured the market.

Moreover, the November 17, 1999 articles issued in the Boulder Daily Camera and the Rocky Mountain News, which did not include the quote from Dr. Christoffersen that all of Ribozyme's news had already been released, does not prove that the sophisticated financial journalists were somehow confused as to whether Ribozyme would be releasing further announcements. The short articles disclosed that Ribozyme's stock rose substantially after the November 15, 1999 Media Advisory and that the stock's gains were pared after the shares were halted and the company issued a second press release, disclosing it had begun a new trial of the cancer drug. These articles did not contradict the Bloomberg article released after the close of trading on November 16, 1999. Instead, the Boulder Daily Camera and the Rocky Mountain News, which are not specialized financial newspapers, just did not include as comprehensive coverage of the Ribozyme story as did Bloomberg. These articles do not establish that the market was still "confused" following the Bloomberg article.

The gravamen of Plaintiffs' complaint centers on the misleading information in the November 15, 1999 Media Advisory. I conclude that no substantial question exists that market reliance on that information, after the public disclosure by Bloomberg following the close of trading on November 16, 1999, would be unreasonable. As a result, the class is limited to those persons who purchased or otherwise acquired the common stock of Ribozyme Pharmaceuticals, Inc. between the close of trading on November 15, 1999 and the close of trading on November 16, 1999. If later events suggest that a narrower class is appropriate, I have the power to alter the class description. *Esplin v. Hirschi,* 402 F.2d 94, 99 (10th Cir.1968); *Cook,* 151 F.R.D. at 380.

Accordingly, **IT IS ORDERED** that

(1) Lead Plaintiffs' motion for class certification is **GRANTED;** and

(2) the class is defined as those persons who purchased or otherwise acquired the common stock of Ribozyme Pharmaceuticals, Inc. between the close of trading on November 15, 1999 and the close of trading on November 16, 1999.