**Barry F. BOVEE, et al., Plaintiffs,**

v.

**COOPERS & LYBRAND, et al., Defendants.**

No. C–2–97–449.

United States District Court, S.D. Ohio, Eastern Division.

July 30, 2003.

Michael G. Brautigam, Law Offices of Gene Mesh and Associates, Cincinnati, OH, for plaintiff.

David Cupps, Vorys, Sater, Seymour and Pease, LLP, Columbus, OH, for Coopers & Lybrand.

Michael Young, Willkie Farr and Gallagher, for Individual defendants.

### Opinion and Order

SARGUS, District Judge.

This matter is before the Court on plaintiffs' motion for class certification under Fed. R.Civ.P. 23(b)(3). Plaintiffs are investors who purchased stock in Mid–American Waste Systems ("MAW"). Before its bankruptcy in January 1997, MAW was a publicly traded stock on the New York Stock Exchange. Plaintiffs bring this action against former executive officers of MAW—Christopher L. White, Dennis P. Wilburn, Richard A. Widders, Jr., and R. Jay Roberts—and Coopers & Lybrand L.L.P., which performed accounting services for MAW. The second amended complaint asserts violations of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b). Plaintiffs allege that defendants released false and misleading financial information about MAW, thereby perpetrating a fraud on the securities market.

Plaintiffs seek to certify a class of investors, other than corporate officers, who purchased MAW common stock between March 29, 1994 and January 21, 1997. Plaintiffs contend that the defendant disseminated misleading information which artificially inflated the market price of MAW stock, in violation of § 10(b) of the Securities and Exchange Act and SEC Rule 10b–5. According to plaintiffs, class members, relying on the integrity of the market, purchased stock at artificially inflated prices and were damaged when the alleged wrongdoing of defendants was disclosed, the value of MAW stock declined, and MAW filed for bankruptcy. Defendants oppose class certification and contend that plaintiffs' fraud on the market theory cannot apply to this case because the market for MAW securities was not open and efficient. According to the defendants, certification is not proper because issues of individual reliance on the alleged misrepresentations will predominate.

For the reasons set forth below, plaintiffs' motion for class certification is GRANTED.

### I. Motion to Strike

Defendant Coopers & Lybrand has filed a motion to strike the January 29, 2003 second affidavit of Ervin Schoenblum and the January 29, 2003 affidavits of plaintiffs Barry Bovee, Wendy Bovee, and Brian Bovee.[1] Plaintiffs submitted these affidavits in their reply memorandum in support of the motion to certify. Defendant contends that these affidavits violate S.D. Ohio Civ. R. 7.2(e), which states that "[e]vidence used to support a reply memorandum shall be limited to that needed to rebut the positions argued in memoranda in opposition." Defendant further argues that the affidavit of Schoenblum should be excluded because it does not satisfy the admissibility requirements of Fed.R.Evid. 702.

Plaintiffs counter that a court cannot use Fed.R.Civ.P. 12(f) to strike an affidavit. Plaintiffs are correct on this point. Under Rule 12(f), the court "may order stricken *from any pleading* any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." (Emphasis added). Rule 12(f) "is neither an authorized nor a proper way ... to strike affidavits." Wright & Miller, Fed. Prac. & Proc., § 1380 (footnote omitted). *See also Dawson v. City of Kent,* 682 F.Supp. 920, 922 (N.D.Ohio 1988). Nonetheless, a district court may exclude from consideration an affidavit that it deems improper. *See Lombard v. MCI Telecomm.*

---

1. Plaintiffs request oral argument concerning the motion to strike. S.D. Ohio Civ. R. 7.1(b)(2) states that unless oral argument is deemed essential to the fair resolution of the case because of its public importance or the complexity of the issues, motions shall be decided based solely on memoranda. The Court finds that oral argument is not essential to the motion to strike. Plaintiffs' request is therefore denied.

*Corp.*, 13 F.Supp.2d 621, 625 (N.D.Ohio 1998).

■ The Court agrees with defendant that the January 29, 2003 Schoenblum affidavit should be excluded from consideration. "When proof of facts not already of record is necessary to support or oppose a motion, all evidence then available shall be discussed in, and submitted no later than, the primary memorandum of the party relying upon such evidence." S.D. Ohio Civ. R. 7.2(e). The magistrate judge reminded plaintiffs of their obligation in this regard. *See* Tr. of Sept. 9, 2002 Status Conf. at pp. 16–17 ("I am requiring you to put everything on the table that you have supporting a motion to certify in your initial brief because that's the fair rules of the game under our local rules and under the civil rules of procedure"); Sept. 13, 2002 Status and Scheduling Conf. Order at p. 2.

Schoenblum's second affidavit focuses on whether shares of MAW were traded in an open and efficient market during the class period. Schoenblum discusses factors and events which lead to his conclusion that shares of MAW were traded in an open and efficient market. In doing so, he examines the stock's trading volume, the number of analysts reporting on MAW stock, and the reaction of share price to news events.

While the affidavit is largely structured as a point-by-point rebuttal to the declaration of defendant's expert James K. Malernee, Jr. (submitted in defendant's memorandum in opposition to the motion to certify), the Court concludes that the assertions contained in the affidavit should have been included in plaintiffs' motion to certify. Plaintiffs argue they had no way of knowing that defendants would oppose the motion to certify by asserting MAW was not traded on an efficient market. Plaintiffs contend that defendant sandbagged them by raising this issue in their opposition brief. The Court rejects this contention. In their answer to the second amended complaint, defendants asserted as a defense, "MAW securities were not traded on an efficient market at the time of some or all of the purchases of stock identified by plaintiffs in the Complaint." Answer, p. 38. Further, Schoenblum's original affidavit—submitted with plaintiffs' motion to certify—states that he prepared the affidavit in part "to establish that the New York Stock Exchange ('NYSE') is an open, developed and efficient market, which reacts in such a manner to public financial information regarding the shares traded thereon and specifically the shares of [MAW], whose shares are the subject of this litigation and were formerly traded on the NYSE." Nov. 8, 2002 Schoenblum Aff., ¶ 1. He stated, "MAW had approximately 28,000,000 shares outstanding, and an average of about 150,000 shares trading per day. This results in annual turnover of shares of more than 100%. The Company was actively followed by several brokerage firm securities analysts ...." *Id.*, ¶ 4.

Thus, plaintiffs put forth evidence in support of their motion to certify that MAW was traded on an efficient market. Under S.D. Ohio Civ. R. 7.2(e), plaintiffs should have put all evidence in support of this factual assertion into their motion to certify. Of his original affidavit Schoenblum admitted, "I had been asked to and did prepare an affidavit, dated November 8, 2002 primarily addressing the fact that the shares of [MAW] ... traded on an efficient market during the class period." March 14, 2003 Schoenblum Aff., ¶ 2. Even though Schoenblum's second affidavit purports to be a rebuttal of Malernee's declaration, it essentially is an attempt to introduce factual evidence that should have been presented in the motion to certify. For that reason, and without comment on whether the affidavit satisfies the requirements of Fed.R.Evid. 702, the Court will exclude the January 29, 2003 affidavit of Ervin Schoenblum from consideration in deciding plaintiff's motion to certify a class action.

■ Defendant argues that the January 29, 2003 affidavits of plaintiffs Barry Bovee, Wendy Bovee, and Brian Bovee should be excluded because they likewise violate Local Rule 7.2(e). The Court agrees. In these affidavits, the Bovee plaintiffs assert that they are adequate class representatives. The issue of adequacy of representation is fundamental to the class certification analysis. Fed.R.Civ.P. 23(a)(4); *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1079

(6th Cir.1996). Facts used in support of the assertion that plaintiffs are adequate class representatives should have been presented in the motion to certify. Nonetheless, the Court will not exclude paragraphs two and three of the affidavits of Barry Bovee and Wendy Bovee because they relate to their inability to attend a January 15, 2003 settlement presentation—facts not available at the time plaintiffs filed their motion to certify.

## II. Background

### A. Allegations

The second amended complaint alleges that MAW's 1993 year-end Form 10–K contained material misrepresentations and omissions. Second Am. Compl., ¶ 24. The 1993 Form 10–K was filed with the SEC on March 29, 1994. The alleged misrepresentations included, *inter alia,* overstating the company's assets, net income, retained earnings, and shareholder equity, understating costs and failing to write-down impaired assets, presenting the company in a favorable light even though defendants knew it was on the verge of bankruptcy, and failing to disclose that some of its landfill operations did not comply with environmental regulations. *Id.,* ¶¶ 25–63.

The second amended complaint makes similar allegations with respect to MAW's May 17, 1994 prospectus. Plaintiffs allege that audited financial statements contained in the prospectus overstate MAW's assets and understates MAW's expenses, thus providing an inaccurate accounting of MAW's true financial condition. *Id.,* ¶¶ 65–66. Plaintiffs allege that defendants made misrepresentations about MAW's landfills by failing to disclose its non-compliance with environmental regulations and inability to accept additional waste. *Id.,* ¶¶ 68–70. Similar allegations are made with respect to MAW's December 31, 1994 and December 31, 1995 Forms 10–K, filed respectively with SEC on April 4, 1995 and April 16, 1996. *Id.,* ¶¶ 105–137, ¶¶ 138–166.

A Form 8–K was filed on February 2, 1996 stating that Coopers & Lybrand had resigned as MAW's certifying accountant and that the United States Attorney for the Northern District of Indiana was conducting a criminal investigation of MAW and defendant White. *Id.,* ¶¶ 168–71. The Form 8–K further disclosed that evaluation of MAW's costs and accruals "could require significant additional charges for asset impairment, asset write-downs, and additional accruals." *Id.,* ¶ 172. White stepped down as C.E.O. on February 6, 1996, and Gene Meredith was appointed to succeed White. *Id.* at ¶ 168. New management was in place at MAW by May 1996. *Id.* at ¶ 170.

MAW's new auditor, SCS Engineers, assisted in the preparation of a Form 10–Q for the quarter ending September 30, 1996. *Id.,* ¶ 180. The Form 10–Q disclosed that MAW's assets were impaired in the amount of $186 million and showed that closure and post-closure costs were understated by $70 million. *Id.* The Form 10–Q also disclosed that investments in certain projects were "materially impaired" and that some projects were "written off entirely." *Id.* at ¶ 181. When the Form 10–Q became public, MAW's stock dropped "precipitously" in value. *Id.* at ¶ 180.

The second amended complaint further alleges that MAW did business through bribery, slush funds, and payoffs. *Id.,* ¶¶ 182–196. Plaintiffs maintain that defendants White and Wilburn diverted corporate assets for their own purposes. *Id.,* ¶ 185. Plaintiffs also allege that MAW improperly reported amortization and depreciation of landfill assets, as well as improperly estimated closure and post-closure costs. *Id.,* ¶¶ 199–216. Plaintiffs further contend that defendant Coopers & Lybrand violated generally accepted accounting standards in preparing financial statements and reports for MAW. *Id.,* ¶¶ 217–280.

### B. Class Definition

The named plaintiffs are twenty investors who purchased shares of MAW stock between March 17, 1995 and January 16, 1997. *Id.* at ¶ 8(a)-(s); Pls.' Mot. For Class Cert, Ex. B. These plaintiffs seek to represent a class of investors who purchased shares of MAW stock between March 29, 1994 and January 21, 1997. The second amended complaint proposes the following class definition:

All persons who purchased publicly-traded MAW common stock securities from March 29, 1994 (the date that MAW's year end 1993 10–K incorporating their false financial statements and audited by [Coopers and Lybrand] were filed with the SEC), through and including January 21, 1997 (the date that MAW sought the protection of the Federal Bankruptcy Laws) (the "Class Period"). Excluded from the Class are Defendants, officers and members of MAW's Board of Directors, members of their immediate families, and all subsidiaries, affiliates, or control persons of such persons and entities.

Second Am. Compl., ¶ 18.

According to the second amended complaint, the class purchased shares at prices that were artificially inflated by the misrepresentations publicly disseminated about MAW. The class allegedly suffered damages when shares of MAW declined in value when word of defendants' alleged wrongdoing became public.

### C. Cause of Action

Plaintiffs assert that defendants violated § 10(b) of the Securities and Exchange Act and accompanying SEC Rule 10b–5. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. The Securities and Exchange Act provides in part,

§ 78j. Manipulative and deceptive devices

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Similarly, the Code of Federal Regulations provides,

§ 240.10b–5 Employment of manipulative and deceptive devices.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Securities and Exchange Commission, 17 C.F.R. § 240.10b–5.

Plaintiffs maintain that defendants released false and misleading information about MAW to the public. Defendants' alleged conduct "created false, misleading, and unjustifiable positive impressions of the financial condition and performance of MAW and thereby artificially inflated the market and issuance prices of MAW's securities throughout the Class Period." Second Am. Compl., ¶ 285. Plaintiffs assert that MAW securities were traded on an efficient and developed market. *Id.*, ¶ 287. "Plaintiffs purchased their MAW securities in reasonable reliance upon the integrity of these markets when, in fact, the integrity of these markets had been tainted by the false and misleading reports, financial statements, release and other publicly-disseminated statements of Defendants." *Id.* As a result, the plaintiff class was defrauded in connection with the purchase and sale of MAW securities. *Id.*, ¶ 285. The plaintiff class was damaged "in that the decline in value of MAW shares was proximately caused by the acts and omissions of the Defendants." *Id.*, ¶ 288.

The second amended complaint further alleges that the individual defendants were "controlling persons" of MAW and therefore are jointly and severally liable for their ac-

tions under 15 U.S.C. § 78t(a). *Id.*, ¶¶ 290–91.

### III. Standard for Class Certification

District courts are required to conduct a "rigorous analysis" into whether the prerequisites of Fed.R.Civ.P. 23 are met before certifying a class. *See General Telephone Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The Court has broad discretion in deciding whether to certify a class, but that discretion must be exercised within the framework of Fed.R.Civ.P. 23. *See Gulf Oil Co. v. Bernard,* 452 U.S. 89, 100, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981); *see also Weathers v. Peters Realty Corp.,* 499 F.2d 1197, 1200 (6th Cir.1974). The party seeking class certification bears the burden of proof. *See Cash v. Swifton Land Corp.,* 434 F.2d 569, 571 (6th Cir.1970); *see also American Medical,* 75 F.3d at 1079.

To meet this burden, plaintiffs must show that all four of the prerequisites of Fed. R.Civ.P. 23(a) are satisfied. *See id.* These prerequisites are often referred to as the numerosity, commonality, typicality, and adequacy of representation requirements. In addition to showing that these requirements are satisfied, plaintiffs must demonstrate that the action falls within at least one of the subcategories of Rule 23(b). *Id.* An action is not maintainable as a class action merely because it is designated as such in the pleadings. *See Cash,* 434 at 571. A mere recitation of the language of Rule 23(a) is not enough. *See Weathers,* 499 F.2d at 1200. Rather, "[t]here must be an adequate statement of the basic facts to indicate that each requirement of the rule is fulfilled." *Id.*

### IV. Fraud on the Market

In order to prevail on a claim of securities fraud under Section 10(b) and Rule 10b–5, a plaintiff must establish the following elements: (1) a misrepresentation or omission, (2) of a material fact, (3) made with scienter, (4) justifiably relied on by plaintiffs, and (5) proximately causing them injury. *Aschinger v. Columbus Showcase Co.,* 934 F.2d 1402, 1409 (6th Cir.1991). While reliance is an essential element of a Rule 10b–5 claim, it will be presumed when the fraud alleged is "fraud on the market." *Basic, Inc. v. Levinson,* 485 U.S. 224, 227, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). "When a plaintiff alleges that a defendant made material misrepresentations or omissions concerning a security that is actively traded on an efficient market, thus establishing a fraud on the market, a rebuttable presumption of reliance arises." *Castillo v. Envoy Corp.,* 206 F.R.D. 464, 468 (M.D.Tenn.2002). A claim of fraud on the market rests on the assumption that in "an open and developed market, dissemination of material misrepresentations or withholding of material information typically affects the price of the stock, and purchasers generally rely on the price of the stock as a reflection of its value." *Peil v. Speiser,* 806 F.2d 1154, 1161 (3rd Cir.1986).

In the Sixth Circuit, a plaintiff must allege the following to invoke the fraud on the market presumption of reliance:

(1) that the defendants made public misrepresentations, (2) that the misrepresentations were material, (3) the stock was traded on an efficient market, (4) that the misrepresentations would induce a reasonable, relying investor to misjudge the value of the stock, and (5) that the plaintiff traded in the stock between the time the misrepresentations were made and the time the truth was revealed.

*Freeman v. Laventhol & Horwath,* 915 F.2d 193, 197–98 (6th Cir.1990). The fraud on the market theory is key to the class certification issue in securities fraud class. Without the benefit of the presumption of reliance, "requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would [prevent plaintiffs] from proceeding with a class action, since individual issues then would have overwhelmed the common ones." *Basic,* 485 U.S. at 242, 108 S.Ct. 978.

### V. Discussion

#### A. Statute of Limitations

■ Actions brought under § 10(b) of the Securities and Exchange Act are subject to a one-year statute of limitations and a three-year statute of repose. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501

U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (adopting the limitations period of 15 U.S.C. § 78i(e)). Securities fraud claims must be brought within one year after the discovery of the facts constituting the violation and within three years after the violation. *Lampf,* 501 U.S. at 364, 111 S.Ct. 2773; 15 U.S.C. § 78i(e). The statute of limitations begins to run when "plaintiff learns, or should have learned through the exercise of ordinary diligence in the protection of one's legal rights, enough facts to enable him by such further investigation as the facts would induce in a reasonable person to sue within a year." *Fujisawa Pharm. Co., Ltd. v. Kapoor,* 115 F.3d 1332, 1334 (7th Cir.1997); *see also Sterlin v. Biomune Sys.,* 154 F.3d 1191, 1199–1201 (10th Cir.1998) (adopting an inquiry notice standard coupled with a reasonable diligence requirement). In no event may the action be brought more than three years after the violation occurred. *See Lampf,* 501 U.S. at 363, 111 S.Ct. 2773.

The proposed class period begins on March 29, 1994, the date MAW filed its 1993 10–K with the SEC. This action was filed slightly more than three years later, on April 22, 1997. The Supreme Court in *Lampf* held, "Because the purpose of the 3–year limitation is clearly to serve as a cutoff, we hold that tolling principles do not apply to that period." *Lampf,* 501 U.S. at 363, 111 S.Ct. 2773; *see also Fischler v. AmSouth Bancorporation,* 971 F.Supp. 533, 536 (M.D.Fla.1997) ("Because section 9(e) is a statute of repose, the '3–year limitation' serves as a 'cutoff' and 'tolling principles do not apply to that period.'") (quoting *Lampf*); *Seeman v. Arthur Andersen & Co.,* 896 F.Supp. 250, 254 (D.Conn.1995) (noting that § 78i(e) "is not subject to the doctrine of equitable tolling").

■ Although plaintiff does not make this argument, a few courts have held that the statute of limitations for § 10(b) claims begins to run upon the purchase or sale of a security, not upon the misrepresentation. *See Kleban v. S.Y.S. Restaurant Mgmt., Inc.,* 912 F.Supp. 361, 367 (N.D.Ill.1995); *Otto v. Variable Annuity Life Ins. Co.,* 816 F.Supp. 458, 461 & n. 3 (N.D.Ill.1991). The better authority is that the statute of limitations is triggered by the misrepresentation that constitutes the securities violation. The Ninth Circuit has held that the statute of limitations is triggered "when a person commits the act that gives rise to liability under [§ 10(b)]." *Asdar Group v. Pillsbury, Madison and Sutro,* 99 F.3d 289, 294–95 (9th Cir.1996). As the judge who authored the *Kleban* opinion later stated, "It is the misrepresentation 'in connection with the purchase or sale,' not the sale itself, that violates Rule 10b–5." *Wafra Leasing Corp.1999–A–1 v. Prime Capital Corp.,* 192 F.Supp.2d 852, 864 (N.D.Ill.2002) (disapproving of *Kleban* and holding that "the 'violation' for the purposes of the Rule 10b–5 statute of repose occurs when the defendant makes a misrepresentation in connection with the sale or purchase of securities."). These holdings are in conformity with § 9(e), which calculates the limitations period with reference to "the violation," not the accrual of the cause of action.

The first misrepresentation alleged in the second amended complaint is MAW's 1993 year-end Form 10–K, filed with the SEC on March 29, 1994. Because that alleged violation occurred more than three years prior to the filing of this suit on April 22, 1997, claims based on that misrepresentation are barred. The next alleged securities violation occurred on May 17, 1994, the date MAW released an allegedly false and misleading prospectus. This alleged violation occurred within the three year period. The Court alters the class definition so that the class period begins on May 17, 1994.

**B. Requirements of Rule 23(b)(3)**

Plaintiffs seek class certification under Rule 23(b)(3), Fed.R.Civ.P. In addition to satisfying the prerequisites of Rule 23(a), discussed below in Part C, plaintiffs must show that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). In determining whether plaintiffs have made this showing, the court may consider:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*Id.*

### 1. Predominance

■ The court must be satisfied that legal and factual issues common to all members of the class will predominate over individual issues. "The predominance test is not a numerical test and does not require the court to add up the common issues and the individual issues and determine which is greater." *Deutschman v. Beneficial Corp.,* 132 F.R.D. 359, 375 (D.Del.1990) (citing Herbert Newberg & Alba Conte, 1 Newberg on Class Actions § 4.25 at 318). "Rather, the court must determine whether the members of the class seek a remedy to a common legal grievance and whether the common questions of law and fact central to the litigation are common to all class members." *Id.*

Here, the focus of the predominance inquiry is on plaintiffs' ability to support a fraud on the market theory. The Sixth Circuit has squarely held, "The fraud on the market theory cannot be applied logically to securities that are not traded in efficient markets." *Freeman v. Laventhol & Horwath,* 915 F.2d 193, 198 (6th Cir.1990). The theory assumes that the price of a security "reflects all the available information about the value of a company." *Id.* at 197. "An inefficient market, by definition, does not incorporate into its price all the available information about the value of a security." *Id.* at 198. The district court may consider five factors in determining whether a security was traded on an efficient market:

(1) a large weekly trading volume; (2) the existence of a significant number of reports by securities analysts; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the

company to file an S–3 Registration Statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases.

*Id.* at 199 (citing *Cammer v. Bloom,* 711 F.Supp. 1264, 1286–87 (D.N.J.1989)).

Defendants argue that plaintiffs cannot support such a fraud on the market theory because the market for MAW securities was not open and efficient. When the fraud on the market theory is unavailable, questions of individual reliance predominate and make class certification inappropriate. *See Basic,* 485 U.S. at 242, 108 S.Ct. 978.

Defendants have submitted the November 27, 2002 declaration of James K. Malernee, Jr., President and C.E.O of Cornerstone Research, an economic and financial consulting firm. Defendants retained Malernee as an expert to analyze whether MAW securities traded on an efficient market. Malernee performed an "event study" in which he examined the price of MAW stock to determine if it was influenced by disclosures made by MAW and the release of other information to the public. Malernee Decl., ¶ 17. Malernee found that "Company disclosures were not driving stock price" and "[m]ost large price changes did not have information releases associated with them." *Id.,* ¶¶ 20, 23. He further determined that coverage of MAW by securities analysts was "limited" in comparison with coverage of other waste management companies, with no analyst reports issued after July 3, 1996. *Id.,* ¶¶ 24, 25. Malernee also found that "the average weekly trading volume was slightly over two percent during the class period." *Id.,* ¶ 25. These findings led Malernee to conclude, "I cannot find economic evidence to prove that MAW was ever trading on an efficient basis during the class period." *Id.,* 31.

The parties dispute how far a court can delve into the merits of the fraud on the market theory when considering a motion for class certification. Defendants cite several cases in which courts have made a preliminary determination as to whether the theory applied. One court rejected the argument that it could not examine "the strength of [plaintiffs'] fraud-on-the-market case" in con-

nection with a motion to certify. *O'Neil v. Appel,* 165 F.R.D. 479, 496 (W.D.Mich.1996). Rather, courts recognize "a special need for factual scrutiny" when a putative class seeks to rely on the fraud on the market theory. *Id.* at 497. Thus, the court required plaintiffs "to make at least a facial showing that the theory will be available to them." *Id.* at 498. *Accord Yadlosky v. Grant Thornton L.L.P.,* 197 F.R.D. 292, 297 (E.D.Mich.2000); *Griffin v. GK Intelligent Systems, Inc.,* 196 F.R.D. 298, 303–304 (S.D.Tex.2000).

Plaintiffs argue that the Court should not consider the Malernee declaration. Plaintiffs contend that the merits of their fraud on the market theory should be addressed at a later stage in the litigation. In *Castillo v. Envoy Corp.,* 206 F.R.D. 464, 470–71 (M.D.Tenn. 2002), the court noted "the fine line" courts must walk when deciding motions to certify in securities class actions. The court, however, criticized some courts' willingness to examine the merits of an asserted fraud on the market theory. *Id.* at 472 n. 10 (joining "the majority of courts that have criticized that view"). Rather, the court concluded that "a preliminary determination as to the 'availability' or applicability of the presumption [of reliance], which is distinct from its actual application, can be made at this stage without dealing with the merits of the case." *Id.* at 471. *Accord Tapken v. Brown,* No. 90–691–CIV–MARCUS, 1992 WL 178984, *27–28 (S.D.Fla. March 13, 1992).

Upon consideration of this issue, the Court agrees with *Castillo.* Courts court may "probe behind the pleadings before coming to rest on the certification question," *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), and consider evidence presented by the parties on the maintainability of the class action. *Weathers v. Peters Realty Corp.,* 499 F.2d 1197, 1200 (6th Cir.1974). However, courts cannot inquire into the merits of the claims pleaded. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). "[N]othing in either the language or history of Rule 23 ... gives a court any authority to conduct a preliminary inquiry into the merits of a suit ...." *Id.* at 177, 94 S.Ct. 2140. *See also Bacon v. Honda*

*of America Mfg., Inc.,* 205 F.R.D. 466, 476 (S.D.Ohio 2001) (noting that the court "may probe behind the pleadings" to analyze the Rule 23 prerequisites but may not "delve into the merits"); *In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 297, 308, 311 (E.D.Mich. 2001) ("At this stage, the Court should not delve into the merits of an expert's opinion or indulge 'dueling' between opposing experts.").

■ Thus, this Court will limit its inquiry to a preliminary determination of whether the fraud on the market theory is available to plaintiffs. The second amended complaint alleges that defendants made material misrepresentations and omissions to the public, that MAW securities were traded on an efficient market, that plaintiffs reasonably relied on the integrity of the market when making investment decisions, and that plaintiffs traded stock between the time the misrepresentations were made and the time the truth was revealed. Second Am. Compl., ¶¶ 282–89. These allegations are sufficient to invoke the fraud on the market presumption of reliance. *Freeman v. Laventhol & Horwath,* 915 F.2d 193, 197–98 (6th Cir.1990).

A court need not accept a facially frivolous claim that stock was traded on an efficient market. In this case, however, Malernee and Schoenblum both stated that MAW was traded on the New York Stock Exchange during the class period. Malernee Decl., ¶ 27; Nov. 8, 2002 Schoenblum Aff., ¶ 1. Courts and commentators have noted that certain markets, such as the NYSE, are particularly efficient. "[I]t appears that securities traded in national secondary markets such as the New York Stock Exchange, as was the case in *Levinson,* are well suited for application of the fraud on the market theory." *Freeman,* 915 F.2d at 199. "[A] well-developed and impersonal market, such as the New York or Pacific stock exchanges, will instantaneously incorporate all publicly available information about a given security into the market price of that security." *Deutschman v. Beneficial Corp.,* 132 F.R.D. 359, 368 (D.Del.1990). *See also In re Bexar County Health Facility Development Corp. Securities Litigation,* 130 F.R.D. 602 (E.D.Pa.1990) (citing 4 A. Bromberg & L.

Lowenfels, *Securities Fraud & Commodities Fraud,* at § 8.6(635) (1989), for the position that certain markets, such as the NYSE and NASDAQ National Market System, should be entitled to a rebuttable presumption of efficiency); *Cammer v. Bloom,* 711 F.Supp. 1264, 1292 (D.N.J.1989); *Tapken,* 1992 WL 178984, at *27–28; Victor L. Bernard, Christine Botosan & Gregory D. *Phillips, Challenges To the Efficient Market Hypothesis: Limits To the Applicability of Fraud–on–the–Market Theory,* 73 Neb. L.Rev. 781, 799, 805 (1994) (concluding that fraud-on-the-market theory should be limited to NYSE, AMEX, and largest NASDAQ companies).

Defendants stress that the specific market for MAW stock is more important than the larger exchange where MAW was traded. One court observed, "Where the stock is traded is not the crucial issue. The important question is whether the stock is traded in a market that is efficient—one that obtains material information about a company and accurately reflects that information in the price of the stock." *Hurley v. Federal Deposit Ins. Corp.,* 719 F.Supp. 27, 33 (D.Mass. 1989). *See also O'Neil v. Appel,* 165 F.R.D. 479, 504 (W.D.Mich.1996). The Malernee declaration, defendants argue, proves that the market for MAW stock was not efficient.

The fact that MAW stock was traded on the NYSE does not, by itself, prevent defendants from ultimately proving MAW was not traded on an efficient market. Even so, courts commenting that "where the stock is traded is not the crucial issue" have done so to make the point that "the mere fact" a security is not traded on NYSE and NASDAQ National Market System does not preclude a finding of efficiency. *See e.g., Binder v. Gillespie,* 184 F.3d 1059, 1065 (9th Cir. 1999) (over-the-counter); *Hurley* (over-the-counter); *O'Neil* (NASDAQ SmallCap), *Harman v. LyphoMed, Inc.,* 122 F.R.D. 522, 525 (N.D.Ill.1988) (over-the-counter). If MAW had been traded over-the-counter, then the Court may have done more probing behind the pleadings in deciding the motion to certify. Because MAW was traded on the NYSE during the class period, the Court is satisfied that plaintiffs have established, for purposes of the motion to certify, that the fraud on the market theory will be available to them. Further, plaintiffs allege that there were approximately 28 million shares of MAW common stock outstanding as of March 15, 1996 and that there were several million shares of MAW common stock traded on the market during the class period. Second Am. Compl., ¶ 19.

■ When the fraud on the market theory is invoked, courts agree that the legal and factual issues common to all members of the class will predominate over individual issues. *See Castillo,* 206 F.R.D. at 473–74; *Powers v. Stuart–James Co., Inc.,* 707 F.Supp. 499, 504 (M.D.Fla.1989); *cf. Basic,* 485 U.S. at 242, 108 S.Ct. 978. Accordingly, the Court finds that plaintiffs have satisfied the predominance requirement.

### 2. Superiority

■ The Court also finds that a class action is the superior method for adjudicating this controversy if indeed the four requirements of Rule 23(a) are satisfied. "It is well-recognized that class actions are a particularly appropriate means for resolving securities fraud actions." *In re Amerifirst Securities Litigation,* 139 F.R.D. 423, 427 (S.D.Fla. 1991) (citing *Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.1985)). Given that the proposed class consists of thousands of members and that the legal claims are narrowed to whether defendants committed securities violations, a class action will be the most fair and efficient way to resolve this dispute. *See Castillo,* 206 F.R.D. at 474 ("Courts have generally considered that class actions are the most favorable means of adjudicating federal securities fraud claims."); *Deutschman v. Beneficial Corp.,* 132 F.R.D. 359, 372 (D.Del.1990) (noting the "policy of favoring class actions in securities fraud cases").

### C. Requirements of Rule 23(a)

#### 1. Numerosity

■ Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). There is no bright line numerical test by which the district court can determine when the numerosity requirement is satisfied, and

the Sixth Circuit has noted that a class action does not require any specific number of members: "Impracticability of joinder is not determined according to a strict numerical test but upon the circumstances surrounding the case." *Senter v. General Motors Corp.*, 532 F.2d 511, 523 n. 24 (6th Cir.1976). When class size reaches substantial proportions, however, the numerosity requirement is usually satisfied by the numbers alone. *See In re American Medical Systems, Inc.*, 75 F.3d 1069, 1079 (6th Cir.1996).

Here, plaintiffs allege that there were about 28 million shares of MAW common stock outstanding as of March 15, 1996 and that there were several million shares of MAW common stock traded on the market during the class period. Second Am. Compl., ¶ 19. "These shares were held by thousands of shareholders of record." *Id.* Thus, plaintiffs believe that the class numbers in the thousands. *Id.; see also* Nov. 8, 2002 Schoenblum Aff., ¶ 3.

Defendants do not contest that plaintiffs have met the numerosity requirement. The Court is satisfied that joinder of all members is impracticable. *See Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir.1981) ("[T]he prerequisite expressed in Rule 23(a)(1) is generally assumed to have been met in class action suits involving nationally traded securities."); *Somerville v. Major Exploration, Inc.*, 102 F.R.D. 500, 503 (S.D.N.Y.1984) ("Because of the large number of outstanding shares and common stock warrants of United and Major sold within the period specified, it is reasonable to infer that at least thousands of persons can be identified as owners of such stock."); *accord Ballan v. Upjohn Co.*, 159 F.R.D. 473, 479 (W.D.Mich.1994).

### 2. Commonality

█ Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). The claims of the potential class members need not be factually identical. *See Putnam v. Davies*, 169 F.R.D. 89, 93 (S.D.Ohio 1996). Rather, "the commonality requirement will be satisfied as long as the members of the class have allegedly been affected by a general policy of the Defendant and the general policy is the focus of the litigation." *Id.; see also Mayo v. Sears, Roebuck & Co.*, 148 F.R.D. 576, 580 (S.D.Ohio 1993). Although Rule 23(a)(2) speaks of "questions" in the plural, there need only be one question common to the class. *See Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir.1998) (en banc) (citing *American Medical,* 75 F.3d at 1080). The mere fact that questions peculiar to individual class members could remain does not necessarily defeat a finding of commonality. *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir.1988); *Bacon v. Honda of America Mfg., Inc.*, 205 F.R.D. 466, 476 (S.D.Ohio 2001). Conclusory allegations of commonality are insufficient to satisfy the burden of proof on certification. *Falcon,* 457 U.S. at 157, 102 S.Ct. 2364; *American Medical,* 75 F.3d at 1081. The class representatives must enumerate questions of law or fact common to the class, "the resolution of which will advance the litigation." *Sprague,* 133 F.3d at 397.

Defendants argue that commonality does not exist because curative public disclosures released during the class period put the class members in different positions. This argument will be discussed later because it pertains more to typicality and adequacy than to commonality. *See e.g., Ballan v. Upjohn Co.,* 159 F.R.D. 473, 480–85 (W.D.Mich.1994) (examining a similar argument about curative disclosures under the typicality and adequacy prerequisites of Rule 23(a)).

The second amended complaint identifies the following common questions of law or fact:

(a) Did Defendants violate Section 10(b) of the Exchange Act and Rule 10b–5 promulgated by the SEC?

(b) Did Defendants participate in and jointly pursue the common course of conduct complained of?

(c) Did MAW's quarterly and annual reports, press releases, and other documents, including the financial statements prepared by [Coopers & Lybrand,] and publicly filed and disseminated or other statements publicly made by the Defendants during the Class Period misrepresent and/or omit material facts about the busi-

ness, finances, and prospects of the Company?

(d) Did Defendants act knowingly and/or recklessly in misrepresenting and/or omitting material facts?

(e) Were the market prices or issuance prices of MAW's securities artificially inflated or maintained during the Class Period? Were the losses suffered by the class the proximate result of [Coopers & Lybrand's] acts?

(f) Did the members of the Class sustain damages and, if so, what is the measure of damages for the wrongs complained of herein?

Second Am. Compl., ¶ 22.

The Court finds that the issues identified by plaintiffs are common to the claims of the class. These questions closely mirror those identified in other cases in which courts have found the commonality requirement "easily" satisfied. *O'Neil*, 165 F.R.D. at 491; *see also Ballan*, 159 F.R.D. at 479; *Yadlosky v. Grant Thornton L.L.P.*, 197 F.R.D. 292, 297–98 (E.D.Mich.2000); *In re Intelcom Group, Inc. Securities Litig.*, 169 F.R.D. 142, 148 (D.Colo.1996); *Tapken v. Brown*, No. 90–691–CIV–MARCUS, 1992 WL 178984, *27–28 (S.D.Fla. March 13, 1992). As one court observed, "[q]uestion of misrepresentation, materiality, and scienter are 'the paradigmatic common question[s] of law in a securities fraud class action." *Deutschman*, 132 F.R.D. at 372 (quoting *Moskowitz v. Lopp*, 128 F.R.D. 624, 629 (E.D.Pa.1989)).

### 3. Typicality

Rule 23(a)(3) requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). A plaintiff's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *American Medical*, 75 F.3d at 1082 (citation omitted). Typicality exists when the "representative's interests [are] aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *Id.* Stated differently, as the Sixth

Circuit has summarized, "as goes the claim of the named plaintiff, so go the claims of the class." *Sprague*, 133 F.3d at 399; *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000).

■ The typicality requirement focuses on the type of injury suffered by the class members and the interests of the various class members. *See Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 64 (S.D.Ohio 1991). The commonality and typicality requirements are closely related because they both help determine whether the claim of the named plaintiff and those of the class are so interrelated that the interests of the absent class members will be protected. *Id.* Like the commonality requirement, the named plaintiff's claims do not have to be identical to the claims and defenses of the other members of the putative class, but there must be a common element of fact or law between the claims. *See Putnam*, 169 F.R.D. at 94.

■ Defendants argue that the typicality requirement is not met because the class members will be divided based on the date they purchased MAW stock. They argue that curative disclosures were released throughout the class period and particularly in 1996. Plaintiffs' claims are not typical of the claims of class members who purchased stock earlier in the class period, defendants contend, because the named plaintiffs largely purchased their stock after MAW made numerous curative disclosures. Defendants rely on *Ballan v. Upjohn Co., supra*, for the proposition that typicality does not exist when curative disclosures are made before some class members purchased stock. The plaintiff in *Ballan* alleged that the defendant corporation failed to disclose detrimental information concerning one of it products. During the class period, various newspapers articles brought to light much of what defendant allegedly had concealed. In *Ballan*, the plaintiff purchased 1000 out of the 1200 shares he owned after the curative disclosures. The court determined that plaintiff was "atypical" because "his interest in the case will be different with regard to the materiality of the curative disclosure than the interest of class members who purchased

prior to the curative disclosure." 159 F.R.D. at 480. Because the plaintiff made so many of his stock purchases after the negative news was released, the court believed that "a serious question exists" about whether he "relied on the integrity of the market." *Id.*

In this case, plaintiffs argue that differences as to when they purchased stock and the price they paid do not make their claims atypical. Plaintiffs allege that defendants engaged in a common scheme to defraud investors during the class period; thus, named plaintiffs and the class share an interest in proving that defendants' misrepresentations artificially inflated the value of MAW stock.

The Court agrees with plaintiffs on this point. The holding in *Ballan* appears to be the exception and perhaps is best explained by the fact that the plaintiff purchased most of his shares after the proposed class period ended. Many courts have observed that differences in the timing of stock purchases by class representatives do not make their claims atypical, if plaintiffs allege a common scheme of misrepresentation. "When a named plaintiff alleges a common course of conduct in a securities class action, the fact that he purchased stock late in the class period does not vitiate his suitability as a class representative." *Katz v. Comdisco, Inc.*, 117 F.R.D. 403, 411 (N.D.Ill.1987) (citing cases); *see also In re Consumers Power Co. Securities Litig.*, 105 F.R.D. 583, 608 (E.D.Mich.1985) ("Late purchasers have a special incentive to prove the case of the earlier purchases, because this helps them establish defendants' liability in their own cases."); *Fox v. Equimark Corp.*, No. 90–1504, 1994 WL 560994, *4 (W.D.Pa. July 18, 1994) ("All purchasers of stock during a class period share a common interest in showing that the stock was unlawfully inflated."). As one commentator has noted,

> Defendants in securities class actions have often argued that a plaintiff's claim cannot be typical of the claims of class members who purchased at different times in reliance on different documents. It is now settled, however, that the claims of such a plaintiff are typical of the claims of the class if all the documents relied upon are

part of a common course of conduct or common scheme to defraud.

7 Newberg on Class Actions § 22.26 (citing cases); *accord Stoller v. Baldwin–United Corporation, et al.*, No. 82–1438, 1985 WL 5809, *16 (S.D. Ohio June 4, 1985). "Normally when a complaint alleges an essential continuity of omissions or material representations, the claim of the class representative is considered typical for the class for the entire period from the date of the first objectionable report to the date of the full disclosure." 7 Newberg on Class Actions § 22.26.

Here, plaintiffs allege a common course of conduct by defendants. The second amended complaint alleges that defendants made misrepresentations in their 1994 and 1995 Form 10–Ks, as well as a May 1994 Prospectus. Second .Am. Compl., ¶¶ 24–166. The complaint alleges that defendants repeatedly misrepresented the financial health of the company and its compliance with environmental regulations, among other things. These alleged misrepresentations artificially inflated the price of MAW stock. *See* 7 Newberg on Class Actions § 22.26 ("Normally when a complaint alleges an essential continuity of omissions or material representations, the claim of the class representative is considered typical for the class for the entire period from the date of the first objectionable report to the date of the full disclosure.")

Defendants also argue that the claims of plaintiffs Barry and Wendy Bovee are not typical because they sold some of their stock prior to the end of the class period. *See* Second Am Compl., ¶ 8(a) (stating that Barry and Wendy Bovee sold 4000 shares on December 26, 1996). This argument is unavailing. "[T]he traditional rule" is that "a plaintiff class should be certified despite conflicts over damages issues between early and late sellers of the stock." *Picard Chemical, Inc. Profit Sharing Plan v. Perrigo Co.*, Nos. 1:95–CV–141, 1:95–CV–290, 1996 WL 739170, *6 (W.D.Mich. Sept.27, 1996). *See e.g., Freedman v. Louisiana–Pacific Corp.*, 922 F.Supp. 377, 400 (D.Or.1996); *In re Mutual Sav. Bank Securities Litig.*, 166 F.R.D. 377, 384 (E.D.Mich.1996); *Welling v. Alexy*, 155 F.R.D. 654, 662 (N.D.Cal.1994); *but see In re Seagate Technology II Securities Litig.*, 843

F.Supp. 1341, 1359 (N.D.Cal.1994). "[I]ndividual differences regarding the purchasing and selling of stock during the proposed class period does not destroy the typicality requirement. All purchasers of stock during a class period share a common interest in showing that the stock was unlawfully inflated." *Fox v. Equimark Corp.*, Fed. Sec. L. Rep. ¶ 98,384, 1994 WL 560994, *4 (W.D.Pa. July 18, 1994) (citing *Simon v. Westinghouse Electric Corp.*, 73 F.R.D. 480, 484 (E.D.Pa. 1977)).

Next, defendants argue that some of the class representatives will be subject to the unique defense of non-reliance. Defendants point to the deposition testimony of certain plaintiffs who purchased stock because they thought MAW would be bought by another company and stock value would increase. Sept. 6, 2002 Dep. of Ronald Gerhart, pp. 40–41; Sept. 10, 2002 Dep. of William Yurkovic, p. 50. Courts have found that similar arguments of non-reliance do not defeat typicality because the defense is not unique and because it goes too far into the merits. *See Deutschman,* 132 F.R.D. at 373 (citing cases for the holding that "a 'no-reliance' defense in a securities fraud class action is not the kind of defense unique to the named plaintiff which would render his claim atypical"); *In re Data Access Sys. Securities Litig.,* 103 F.R.D. 130, 139–40 (D.N.J.1984) ("[E]ven if [defendants] can prove non-reliance as an affirmative defense, this goes to the merits of the case and cannot be considered by the court on a certification motion."); *In re Control Data Corp. Securities Litig.,* 116 F.R.D. 216, 221 (D.Minn.1986) (defense of market "speculation" on part of plaintiff did not defeat typicality); *Ridings v. Canadian Imperial Bank of Commerce Trust Co. (Bahamas) Ltd.,* 94 F.R.D. 147, 151 (D.Ill.1982). Moreover, that plaintiffs Gerhart and Yurkovic bought stock based on speculation does not prove non-reliance. They perhaps made their purchases in reliance that the price paid accurately reflected the value of MAW stock at the time of purchase, but hoping the value would soon increase. *Cf. In re Adobe Systems, Inc. Securities Litig.,* 139 F.R.D. 150, 155 (N.D.Cal.1991) (calling the argument of non-reliance "virtually meaningless ... in an open market situation"). If the price was

artificially inflated at the time Gerhart and Yurkovic bought stock, then they suffered injuries typical of the class.

Defendants also argue that plaintiffs Barry and Wendy Bovee will be subject to the unique defense of statute of limitations. Under 15 U.S.C. § 78i(e), securities fraud claims must be brought within one year after the discovery of the facts constituting the violation and within three years after the violation. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). Plaintiffs filed this suit on April 22, 1997. Barry and Wendy Bovee purchased some of their stock before April 22, 1996. Defendants, however, do not point to a particular time by which plaintiffs discovered facts constituting the alleged violation. Defendants elsewhere list a series of allegedly curative disclosures beginning in February 1996. Without attempting to discern when the market was cured, it is unclear at what time plaintiffs discovered, or should have discovered, if ever, facts constituting the violation. *Cf. Seeman v. Arthur Andersen & Co.,* 896 F.Supp. 250, 254 (D.Conn.1995) (noting that "any time-bar arguments based on the one-year discovery rule cannot be resolved properly" on a motion to dismiss). The second amended complaint alleges that defendants continued to defraud the market as late as April 16, 1996, the date MAW filed its 1995 Form 10–K. The Court cannot say at this stage in the litigation that plaintiffs should have discovered the violation by April 22, 1996. *See Marks v. CDW Computer Ctrs., Inc.,* 122 F.3d 363, 367 (7th Cir.1997) (whether a plaintiff had sufficient information to place it on inquiry notice is a question of fact).

Lastly, defendants argue that plaintiff Brian Bovee will be subject to the unique defense of lack of standing. On May 11, 1999, Brian Bovee and his wife filed a petition for bankruptcy in the Southern District of Florida under Chapter 7 of the United States Bankruptcy Code. Sept. 26, 2002 Dep. of Brian Bovee, Ex. 16. According to defendants, he did not schedule his cause of action in this case as an asset. It is well-established that "any cause of action which has accrued to the Debtor as of the filing of the

612

petition is property of the estate and may only be prosecuted on behalf of the estate." *In re Bell & Beckwith,* 64 B.R. 144, 147 (Bankr.N.D.Ohio 1986); *see* 11 U.S.C. § 541(a)(1) (property of the estate in bankruptcy includes "all legal or equitable interests of the debtor in property as of the commencement of the case"). Once the petition for bankruptcy is filed, the debtor lacks standing to prosecute any cause of action he otherwise could have maintained. *See Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,* 322 F.3d 147, 156 (2d Cir.2003) (the "trustee stands in the shoes" of the debtor and has "standing to bring any suit that [the debtor] could have instituted had it not petitioned for bankruptcy"); *In re Louden,* 106 B.R. 109, 111–12 (Bankr.E.D.Ky.1989).

If Brian Bovee is without standing, he is not entitled to have his claims litigated in federal court. *See Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 117 (2d Cir.1991) (citing U.S. Const., Art. III). The matter of Bovee's standing is not particularly well framed at this point of the proceeding. Defendants raised the issue in a footnote. Plaintiffs responded by merely stating that Brian Bovee did not need to schedule this case as an asset because its value was speculative, an argument unsupported by statutory and case law. The assets of a debtor in bankruptcy remain the property of the estate until abandoned by the trustee. 11 U.S.C. § 554(d). If the trustee abandons property rights to a cause of action, it returns to the debtor. *Id.* While an order of discharge is attached to Brian Bovee's deposition, *see* Ex. 18, there is no evidence of record about whether the trustee abandoned any of Bovee's assets.

More importantly, an unscheduled asset cannot be abandoned. *See In re Cundiff,* 227 B.R. 476, 478–479 (6th Cir. BAP 1998) ("It is clear that an asset must be properly scheduled in order to pass to the debtor through abandonment under 11 U.S.C. § 554."); *In re Peebles,* 224 B.R. 519, 520–521 (Bankr. D.Mass.1998); *In re Serrato,* 214 B.R. 219, 226 (Bankr.N.D.Cal.1997). Thus, Bovee's cause of action remains the property of the bankrupt estate if defendants are correct

that Brian Bovee never disclosed this action during the bankruptcy proceeding. *In re Cundiff,* 227 B.R. at 479 (noting that "the bankrupt estate retains unscheduled assets"). It appears from the record that Brian Bovee indeed failed to schedule this cause of action. Before the Court can confidently determine that he lacks standing, however, it must be satisfied that Bovee never scheduled or otherwise disclosed this cause of action in the bankruptcy proceeding and that there are no valid reasons why the cause of action would have reverted to Bovee. If defendants contend that Brian Bovee lacks standing to prosecute this action, they may file a motion to dismiss his claims against them.

Even if Brian Bovee lacks standing, the Court does not believe that this destroys typicality. The appropriate course of action would be to exclude him from the plaintiff class. *See In re Milk Products Antitrust Litigation,* 195 F.3d 430, 436 (8th Cir.1999) (holding that plaintiff who was dismissed for lack of standing "could not represent the class"); *Weiner v. Bank of King of Prussia,* 358 F.Supp. 684, 694 (E.D.Pa.1973) ("Without standing, one cannot represent a class ...."). With him excluded, the Court finds no evidence that the claims of the remaining representatives are atypical of the class.

Accordingly, the Court finds that the claims of the class representatives are typical of those of the class.

### 4. Adequacy of Representation

Rule 23(a)(4) permits certification if "the representative parties will fairly and adequately protect the interests of the class." This requirement is essential to due process because a final judgment in a class action is binding on all class members. *See American Medical,* 75 F.3d at 1083 (citing *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940)). In *Senter,* the Sixth Circuit articulated two criteria for determining the adequacy of representation: (1) "the representative must have common interests with unnamed members of the class" and (2) "it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." 532 F.2d at 525. "An individual may not be an adequate

representative if she is subject to unique defenses that place her in a position that is antagonistic to the interests of the class." *Reeb v. Ohio Dept. of Rehab. and Correction,* 203 F.R.D. 315, 322 (S.D.Ohio 2001) (citing *Levels v. Akzo Nobel Salt, Inc.,* 178 F.R.D. 171, 179 (N.D.Ohio 1998)). Defendants do not challenge the qualifications of plaintiffs' counsel.

■ Defendants again argue that a series of curative disclosures divide the named plaintiffs from the class. If true, the named plaintiffs cannot serve as class representatives, according to the defendants, because "the class period should end when curative information is publicly announced or otherwise effectively disseminated to the market." *In re Ribozyme Pharm., Inc. Securities Litig.,* 205 F.R.D. 572, 579 (D.Colo.2001). *See also Shaw v. Digital Equip.,* 82 F.3d 1194, 1222 (1st Cir.1996) (limiting class to those who purchased shares of stock before curative disclosure was made); *Friedlander v. Barnes,* 104 F.R.D. 417, 420–21 (S.D.N.Y. 1984) (discussing cases in which "courts have used curative announcements to define the limits of the class period").

Defendants point to a number of allegedly curative disclosures. *See* Attachments to Dec. 16, 2002 Aff. of Robert N. Webner. They claim MAW's 1993 Form 10–K disclosed that MAW had a net loss of $23 million in 1993, had taken $49 million in charges, failed to comply with financial performance ratios and covenants of its bank credit and senior note agreements, and would not meet its debt service obligations. Further, MAW's 1994 Form 10–K disclosed that MAW was the subject of a criminal investigation, had suffered $50 million in closure and post-closure costs, had lost $5.2 million in connection with its Gary, Indiana landfill, and was non-compliant with certain terms of its bank credit agreement.

The Court is not convinced that the 1993 and 1994 Form 10–Ks should be treated as curative disclosures. These are the very documents alleged in the second amended complaint to be false and misleading. *See* Second Am. Compl., ¶¶ 24–63, 105–137. While the forms may have disclosed some negative information about MAW, plaintiffs allege that certain other negative information was not disclosed. *See In re Intelcom Group, Inc. Securities Litig.,* 169 F.R.D. 142, 151 (D.Colo.1996) (noting factual dispute over whether a press release was curative or was itself misleading).

Defendants also point out that, beginning in February 1996, a great deal of curative information about MAW was released to the public. Even the second amended complaint indicates as much. *See* Second Am. Compl., ¶¶ 168–72, 180 (discussing the February 2, 1996 Form 8–K and third quarter 1996 Form 10–Q). Three successive MAW press releases in February 1996 disclosed that:

- MAW had "underperformed expectations" and anticipated a loss from operations;
- MAW had sold landfills in Georgia;
- MAW expected "a fourth quarter 1995 charge of between $70 and $80 million after taxes";
- the United States Attorney for the Northern District of Indiana was conducting a criminal investigation of MAW;
- an evaluation of MAW's costs and accruals would likely "require significant additional charges for asset impairment, asset write-downs, and additions to these accruals" in excess of $200 million;
- defendant White would take a leave of absence from his positions as President, Chairman, and C.E.O.; and
- MAW was in default of certain financial covenants.

Webner Aff., Exs. O–Q.

Two press releases in April 1996 announced that:

- former MAW officers had been indicted;
- the SEC had contacted MAW "regarding a matter under inquiry";
- MAW had a non-recurring charge of $197.1 million;
- MAW suffered a net loss of $182.6 million in 1995;
- MAW expected additional closure, post-closure, and remediation expenses of $20 million;

- MAW had impairment losses of $42.5 million at three landfills;
- MAW remained in default of its financial covenants;
- net losses would continue in 1996;
- MAW "may be required to seek protection under the bankruptcy laws."

*Id.*, Exs. R, S.

On May 15, 1996, MAW announced a first quarter net loss of $6.72 million and restated that an evaluation of MAW's costs and accruals would likely "require significant additional charges for asset impairment, asset write-downs, and additions to these accruals." *Id.*, Ex. U. This was repeated in MAW's Form 8–K, filed May 31, 1996. *Id.*, Ex. V.

MAW's second quarter Form 10–Q, filed August 14, 1996, disclosed that the company was continuing to suffer losses ($18.8 million), had taken $10.2 million in additional charges, and expected to have another $200 million in additional charges. *Id.*, Ex. W. MAW's third quarter Form 10–Q, filed November 14, 1996, disclosed that MAW lost $270 million in that quarter, had taken another $186 million in asset write-downs, and increased its closure and post-closure costs by $70 million. *Id.*, Ex. X. In addition, stockholders' equity was negative $184 million, and MAW's accumulated deficit was $446 million. *Id.*

According to Mr. Malernee, defendants' expert, the price of MAW stock was at $5.00 per share on October 9, 1995. Defs.' Exs. A–3, A–4, A–6, A–7. The price declined over the next several months, dropping to $2.25 by February 2, 1996 and under $1.00 by June 27, 1996. At the end of the class period, MAW stock had dropped below $0.50 per share. *Id.*

Of the purchases made by the named plaintiffs, only Barry Bovee and Wendy Bovee bought MAW stock before the negative information began to hit the market. They purchased stock on March 17, August 18, November 7, and November 9, 1995. Pls.' Mot. For Class Certification, Ex. D–1; Second Am. Compl., ¶ 8(a). Barry Bovee and Wendy Bovee also bought stock on April 26 and May 2, 1996. *Id.*, ¶ 8(b)-(d). According to the complaint, the other named plaintiffs purchased stock on: April 22 and 23, 1996; June 25, 1996; July 10, 1996; September 3, 6, 13, and 25, 1996, October 1–3, 7, 11, and 28, 1996; November 11, 12, and 19, 1996; and January 16, 1997. *Id.*, ¶ 8(e)-(s). Outside the purchases in 1995, the remainder of the purchases were made for $1.50 or less per share. *Id.*

"Courts must tread a fine line" when "parties dispute whether a particular release cured prior misrepresentations." *In re Ribozyme*, 205 F.R.D. at 579. While a court cannot delve into the merits, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), it should preliminarily evaluate when curative information was publicly announced or otherwise disseminated to the market, for the class period should end when prior misrepresentations are fully cured. *See In re Ribozyme Pharm.*, 205 F.R.D. at 579; *In re Data Access Sys. Securities Litig.*, 103 F.R.D. 130, 143–44 (D.N.J.1984). Thus, a majority of courts engage in a limited review to determine when a market was cured of prior misrepresentations. *See In re Ribozyme Pharm.*, 205 F.R.D. at 579; *In re Intelcom Group, Inc. Securities Litig.*, 169 F.R.D. 142, 151 (D.Colo.1996). "Courts that have engaged in this limited review refuse to narrow the class period if 'there is a substantial question of fact as to whether the release had cured the market or was itself misleading.' " *Id.* (quoting *In re Kirschner Medical Corp. Securities Litig.*, 139 F.R.D. 74 (D.Md.1991)).

The Court finds that there is a substantial question of fact as to when the market was cured. Without question, a good deal of negative information about MAW came out before any of the class representatives, other than Barry Bovee and Wendy Bovee, purchased stock. The price of MAW stock dropped below one dollar by the time some of the named plaintiffs made their purchases. Thus, on one hand, it is difficult to believe the share price was artificially inflated. On the other hand, the complaint alleges that on April 16, 1996—in the midst of those negative disclosures—defendants filed a 1995 Form 10–K containing numerous misrepresentations and omissions. Second Am. Compl., ¶¶ 138–166. Plaintiffs allege that the 1995

Form 10–K overstated (by several hundred million dollars) the value of MAW's assets and that it failed to disclose problems in complying with environmental regulations at certain facilities, significant costs necessary to achieving compliance, and numerous land-fill capacity problems. *Id.* These allegations raise a substantial question about when the alleged misrepresentations were cured and whether the class representatives bought stock before that time.

Even if defendants are correct that the market was cured in February 1996 or soon thereafter, plaintiffs Barry and Wendy Bovee purchased some of their stock in 1995. Thus, if they have standing, as discussed *infra,* they can serve as class representatives regardless of whether the Court ultimately shortens the class period and excludes some of the presently-named plaintiffs from the class.

Defendants also argue that the named plaintiffs are not suitable class representatives because their participation in the suit has been minimal and they have abdicated control of the suit to counsel. Certain plaintiffs testified that they did not how they became involved in the lawsuit or became class representatives or how plaintiffs' counsel was selected, and they stated that they had not met with plaintiffs' counsel before the deposition and had not reviewed the complaint. Aug. 27, 2002 Dep. of Barry Bovee, at 161–65, 171–73; Aug. 27, 2002 Dep. of Wendy Bovee, at 30, 38; Sept. 10, 2002 Dep. of William Yurkovic, at 143–44; Sept. 6, 2002 Dep. of Ronald Gerhart, at 113–14, 116–17; Sept. 24, 2002 Dep. of Charles Banacos, at 222–23. Defendants particularly attack Barry Bovee, who stated that he did not believe it was his responsibility "to supervise the lawyers in this case" or to ensure that "this case is diligently prosecuted." Brian Bovee Dep., at 59.

■ A court may deny class certification when class representatives have "so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 727 (11th Cir.1987); *accord*

*Maywalt v. Parker & Parsley Petroleum Co.,* 67 F.3d 1072, 1077–78 (2d Cir.1995).

Because the issue of adequate class representation arises in a wide variety of contexts, it would be inappropriate for us to establish a standard for general application. We conclude, however, that in securities cases such as these, where the class is represented by competent and zealous counsel, class certification should not be denied simply because of a perceived lack of subjective interest on the part of the named plaintiffs unless their participation is so minimal that they virtually have abdicated to their attorneys the conduct of the case. To require less would permit attorneys essentially to serve as class representatives; to require more could well prevent the vindication of the legal rights of the absent class members under the guise of protecting those rights.

*Kirkpatrick,* 827 F.2d at 727–28.

■ Upon review of the depositions, the Court finds that the named plaintiffs are adequate class representatives in this regard. While the named plaintiffs might not be as well-informed or involved as some, they have vigorously prosecuted the interests of the class through qualified counsel and will likely continue to do so. Each plaintiff has demonstrated his or her willingness to prosecute this suit in the six years since it has been filed. Barry Bovee testified that: he has kept "abreast on every move that was made from day one"; he believes it is his obligation to ensure that the class is represented by competent and experienced counsel; he read a draft of the complaint before it was filed and was satisfied that the allegations made were correct; and he is prepared to pay litigation costs. Barry Bovee Dep., at 171, 174, 179, 182, and 204. Mr. Yurkovic stated that it was his "responsibility to hire counsel, competent counsel, to monitor the case, to provide any information that's pertinent to the case, and then to keep . . . the other class representatives informed," as well as to pay litigation costs. Yurkovic Dep., at 146–47; *accord* Gerhart Dep., at 133–35; Banacos Dep., at 202, 224, 237–40. While Brian Bovee stated that it was not his responsibility "to supervise the lawyers in this case" or to ensure that "this case is diligently prosecut-

ed," in context he appears to have meant he was not a lawyer and should not be telling his lawyer the legal theories for the asserted claim. Brian Bovee Dep., at 60. *See Cromer Finance Ltd. v. Berger,* 205 F.R.D. 113, 124 (S.D.N.Y.2001) (rejecting attack on class representatives' unfamiliarity with their legal claims because "plaintiffs are entitled to rely in that regard 'on the expertise of counsel' "). Brian Bovee stated that he is willing "[t]o assist any way I can," including producing documents, monitoring the litigation, providing information, giving deposition testimony, testifying at trial, and paying court costs. *Id.,* at 48–9, 75–7, 79.

Lastly, defendants argue that the class representatives are inadequate because Brian Bovee, William Yurkovic, and Ronald Gerhart submitted inaccurate answers to Interrogatory No. 6 and because plaintiff Shoreline Mortgage Corporation destroyed documents. Interrogatory No. 6 asked plaintiffs to identify documents they consulted, reviewed, or relied on when purchasing MAW stock. Brian Bovee, William Yurkovic, and Ronald Gerhart each responded, "None. Plaintiffs had knowledge of financial statements which were read or reviewed, etc." *See* Brian Bovee Dep., Ex. 14; Yurkovic Dep., Ex. 7; Gerhart Dep., Ex. 4. When asked about this answer, Brian Bovee stated that his father had told him some information about MAW stock, but he did not read any financial statements or materials, *see* Brian Bovee Dep., at 38–9; Yurkovic testified that he "probably looked at financial statements," but could not remember and was not sure what his answer to Interrogatory No. 6 meant, *see* Yurkovic Dep., at 81–2; Gerhart stated that he looked at some earnings reports, but did so after purchasing the stock, *see* Gerhart Dep., at 49–50. While there is some incongruity in the discovery answers and deposition testimony, the Court does not believe it undermines those plaintiffs' credibility to the point that it makes them inadequate class representatives.

Turning to Shoreline Mortgage Corporation, Charles Banacos—who operated the company with his former wife—testified that the company's documents were shredded shortly after it went bankrupt in 1998. Banacos Dep., at 71–7, 126. When he and his wife divorced sometime in 1998, they dis-

solved the company and decided the corporate documents should be destroyed because they were no longer needed. *Id.,* at 72–3, 83, 126. The shredding apparently occurred after Banacos was served with a request to produce documents in this action. *Id.,* at 242–43. According to Banacos, "the shredding had nothing to do with this case or hiding anything or anything to that effect." *Id.,* at 243. While the Court does not approve of the shredding of documents after a document request is served, it does not believe that the possible misconduct or mistaken action by one of several plaintiff merits denying a motion to certify that otherwise should be granted. Banacos testified that he did not shred the documents to hide something in this case, and the shredding has never been the subject of a motion to compel or for sanctions.

Accordingly, the Court finds the putative class representatives have satisfied the adequacy of representation requirement.

## VI. Conclusion

For the reasons stated above, the Court GRANTS plaintiffs' November 12, 2002 Motion for Class Certification under Fed. R.Civ.P. 23(b)(3) (doc. 122). The class period is shortened so that it begins on May 17, 1994 and ends on January 21, 1997.